# Hawes *v.* The State.

### Indictment for Murder.

1. *Change of venue; two or more applications.*—An application for a change of venue is required to be made "as early as practicable before the trial" (Code, § 4485), and its improper refusal, being duly excepted to, is available on appeal from a judgment of conviction rendered at a subsequent term; but, when the application is renewed, after the lapse of three or four months, at the term at which the trial is had, and is again refused, the appellate court will only consider the correctness of the last ruling, on the facts as then presented, since the defendant could not have been prejudiced by the former rulings.

[Hawes v. The State,]

88 37
130 14

88 37
133 64

88 37
138 36

88 37
142 677

88 37
144 613

2. *Same; revision on appeal; presumption in favor of judgment.*—In revising the refusal of a change of venue in a criminal case, this court indulges the presumption, that the ruling of the court below is free from error, and it will not reverse, unless error affirmatively appears. "It is not enough that it may not clearly appear the ruling of the court below was right, or that we, acting as a court of original jurisdiction, would have hesitated to decide as the primary court decided, but we must see, and see clearly, that its action was wrong."

3. *Same; case at bar.*—The application for a change of venue in this case was supported by the affidavits of the defendant himself, his two attorneys, and five other citizens of the county, declaring their belief that, on account of the public excitement and prejudice against him, he could not have a fair and impartial trial in the county, under indictments charging him with the murder of his wife and two young children; and appended to the affidavits were extracts from the county newspapers, and other publications, which stated the facts connected with the discovery of the dead bodies, and circumstances tending to show that he had killed them; and described the state of public excitement and indignation aroused by the discovery of these facts, the formation of a large mob, which proceeded towards the jail where he was confined, and which was dispersed by the sheriff and his officers by the use of fire-arms, resulting in the death of twelve or fifteen persons, and the wounding of many more. Against the application were submitted the affidavits of sixty-five citizens, taken from different portions of the county, and representing different classes and vocations—bankers, physicians, merchants, mechanics, county officers, &c.—who had ample opportunity to know the condition of the public mind at that time, about four months after the occurrence of the events above mentioned, and who stated, in substance, that the excitement created by the discovery of the facts had subsided; that the mob acted under temporary excitement, and many members of it were under the influence of liquor; that their indignation was diverted, by the discharge of fire-arms and the resulting injuries, from the defendant to the sheriff and his officers; that while great interest was felt in the case, and there was a strong desire that the murderer should be discovered and punished, there was no prejudice against the defendant, which assumed his guilt, or would prevent him from having a fair and impartial trial. *Held*, that the record did not show error in the refusal of the application.

4. *Same; oral testimony.*—On application for a change of venue, the evidence is confined to affidavits *pro* and *con*, and witnesses can not be examined *ore tenus*.

5. *Discharge of juror after trial commenced.*—The illness of a juror's wife, shown by the testimony of her attending physician to be such that "her safety, comfort and life required the presence and attendance of her husband," is such a necessity as authorizes his discharge, without or against the defendant's consent, under statutory provisions (Code, § 4453), as well as general principles of law.

6. *Venire for grand jurors; motion to quash indictment.*—When the order for the summoning of grand jurors requires them to be summoned to appear "and serve as grand jurors at the January term of said court, beginning on the 7th day of January, 1889, *to serve as grand jurors for the week beginning on said 7th day of January*, they having been drawn according to law to serve as grand jurors for said term of said court," the italicized words being rejected as surplusage, it affirmatively appears that the jurors were summoned to serve for the term; and an indictment found during the second week will not be quashed, on motion, on that account.

7. *Venire for petit jurors; retrospective law; incomplete record* —It is not a valid objection to the special *venire* in a capital case, that the names of the jurors were drawn under the provisions of a law which was

· [Hawes v. The State.]

enacted after the commission of the offense; nor that the clerk has not at the time written up the minutes containing the order as made.

8. *Examination of juror touching disqualifying opinion as to guilt of accused.*—When a person called as a juror, having been "examined under oath by the court, according to law, touching his qualifications as a juror," is declared competent, and accepted by the State, the defendant can not require that he be asked additional questions, as to any former opinion he may have expressed or entertained, which might influence his peremptory challenge.

9. *Evidence relating to other offenses, as showing motive.*—The defendant being on trial under an indictment for the murder of one of his children, while two other indictments were pending against him for the murder of his wife and another child; and the prosecution having adduced evidence tending to support the theory, that his motive for killing them all was to remove an obstacle to the consummation of a second marriage, which was in fact celebrated a few days after their deaths; any evidence connecting him in any way with the murder of the other members of his family is relevant and admissible, as bearing on the question of motive.

10. *Refreshing memory of witness by reference to memoranda, written or printed.*—A newspaper reporter, called to testify to a conversation had with the defendant at the time of his arrest, may refresh his memory by reference to his notes made at the time; and the notes having been destroyed, he may read and refer, for that purpose, to the printed report of his interview, containing the substance of it, though somewhat abbreviated, and some parts omitted.

11. *Privileged communications between attorney and client.*—Communications made to an attorney by his client, or by any third person acting as agent or friend, with the view of establishing the relation and securing professional advice or assistance, or made to the clerk or agent of the attorney, to be communicated to him, are privileged, and can not be called out as evidence, unless the privilege is waived; but the principle does not extend to communications made by the defendant to the confidential clerk of a law firm, who, being asked by defendant if he was a lawyer, replied that he was not, and to whom the communications were then made without further inquiry or suggestion.

12. *Proof of foreign records.*—The act of Congress providing for the authentication of the records of one State, when offered as evidence in the courts of another (1 U. S. Stat. 122), is not exclusive of any other method of authentication which any State, or its courts, may deem fit to adopt;. that is to say, a transcript is necessarily admissible as evidence, when properly certified as required by the act of Congress, but it may be admissible without such authentication, if properly certified under the laws of the State in which it is offered as evidence.

13. *Proof of marriage license by register.*—By statutory provision, the registers of marriages, &c., kept in pursuance of law, &c., "may be certified by the custodian thereof, and, when so certified, are presumptive evidence of the facts therein stated, as well as of the law or rule in pursuance of which such registry was made, and of the authority to certify the same" (Code, § 2780); and this statute applies equally to registers kept in or out of the State, when properly certified.

14. *Proof of foreign statutes.*—The Revised Code of Mississippi (1880), which purports to be published by authority, and is admitted to be the last compilation of its laws, is admissible as evidence (Code, § 2790) to show who is the proper custodian of a public record, a certified copy of which is offered in evidence.

15. *Proof of character.*—A witness testifying as to the character of the defendant, who was indicted for the murder of his wife and children, may state on cross-examination, "I have heard for the last few years that he frequently had difficulties with his wife and struck her."

16. *Definitions of murder and manslaughter,* as contained in the

[Hawes v. The State.]

affirmative charge of the court to the jury in this case, held correct on the authority of the cases cited.

17. *Charge as to theories of prosecution and defense respectively.*—The court has an undoubted right to state to the jury the theories of the prosecution and the defense respectively, as established by the tendencies of the evidence on each side, in order to bring the facts at issue to their attention.

18. *Misleading charge as to sufficiency of circumstantial evidence.*—A charge instructing the jury that the questions asked each of them by the court, touching his qualifications as a juror, and his answers, in no way restrict or interfere with their right to decide as to the amount, sufficiency or degree of proof required to support a conviction, or as to the amount, degree and sufficiency of proof by circumstantial evidence, is calculated to mislead, and is properly refused.

19. *Charge as to motives in contracting second marriage* —The defendant being indicted for the murder of his wife and two children, and the prosecution proceeding on the theory that his motive was to remove an obstacle to a contemplated second marriage, which was consummated two or three days afterwards, charges based on the purity of his motives in contracting the second marriage, or his honest belief that he had procured a divorce from his first wife, are properly refused.

20. *Charge as to presumption of innocence* —The law presumes innocence of crime in all cases, and requires, to overturn it, evidence which excludes every reasonable hypothesis but that of guilt; but there is no additional presumption founded on the relations existing between the accused and the deceased, as father and child, or husband and wife; and charges asserting, or claiming the benefit of such additional presumption, are properly refused.

21. *Argumentative charges* are properly refused.

FROM the Criminal Court of Jefferson.

Tried before the Hon. S. E. GREENE.

The defendant in this case, Richard R. Hawes, or Dick Hawes, was indicted for the murder of his young daughter, May Hawes, "by drowning her, or by smothering her, or by strangling her, or by some means unknown to the grand jury;" and at the same time two other indictments were found against him, one charging him with the murder of his wife, Mrs. Emma Hawes, and the other with the murder of another daughter, Irene Hawes.    The dead body of May Hawes was found floating on the water in East Lake, near Birmingham, on Tuesday evening, December 4th, 1888; and the verdict of the coroner's jury was, that she came to her death, Monday evening, or night, December 3d, at the hands of her father. The defendant was married in Columbus, Mississippi, on Wednesday, December 5th, to Miss May Storey, whom he had been addressing for some time; and on his return to Birmingham with his wife, on the next day, he was arrested on the charge of murder.    Mrs. Emma Hawes and Irene, a daughter younger than May, had also disappeared, and diligent search being made for their bodies, under the belief that they also had been murdered, the bodies were found,

VOL. LXXXVIII.

several days afterwards, in the water at Lakeview, a suburb of Birmingham, with iron weights attached to them.

The three indictments were returned into court on the 21st January, 1889. On the 24th January, the defendant filed an application for a change of venue in each of the cases, which was overruled by the court on January 28th, and an exception duly reserved by the defendant to its refusal. A second application was made on the 8th February, which does not seem to have been acted on, the cases being continued from March 4th to April 22d; and on that day a third application was made and refused, exception being duly reserved. The opinion states the material facts connected with these several applications and their refusal, and renders a further statement unnecessary.

Being arraigned on the first indictment, the defendant moved to quash it, because the grand jury by which it was presented "was not then a legally constituted grand jury, because said grand jury was ordered by the court to be summoned to appear and serve as a grand jury for one week, commencing on the 7th day of January, 1889, whereas said indictment was presented and filed in court on the 21st day of January, after the expiration of the time for which said grand jury had been summoned to serve." The *venire* for the grand jurors, or order to the sheriff to summon them, was in these words: "You are hereby commanded to summon the following named persons, to appear and serve as grand jurors at the January term of the Criminal Court of Jefferson county, beginning on the 7th day of January, 1889, to serve as grand jurors for the week beginning on the first Monday in January, that being the 7th day of January, 1889, they having been drawn according to law to serve as grand jurors for said term of said court." The court overruled the motion to quash, and the defendant excepted.

The defendant then submitted a motion to quash the special *venire* of petit jurors summoned for the trial of this and other capital cases, which had been set for trial during the same week; the grounds of the motion being, (1) that the special *venire* was ordered and drawn under the provisions of a law enacted after the commission of the offense, and after the finding of the indictment; and (2) because there was no record of the order, the minutes not having been written up by the clerk. The court overruled this motion, and the defendant excepted.

During the organization of the jury, the name of

[Hawes v. The State.]

E. A. Penn having been drawn, he "was examined under oath by the court, according to law, touching his qualifications as a juror, was declared competent by the court, and accepted by the State." The defendant then asked the court to "ask him, whether or not, up to this time, he has had an opinion which would bias his verdict, as to the guilt or innocence of the defendant." The court declined to ask this question, and the defendant excepted; and he then challenged said juror peremptorily. "After twelve jurors had been chosen and sworn to try the case according to law, and before the indictment was read to them, G. B. Gordon, one of the twelve jurors chosen, applied to the court to be excused, because of the sickness of his wife; and Dr. A. M. Boland, a practicing physician in Birmingham, being sworn, stated that the wife of said Gordon was under his treatment, that she was suffering from a complication of diseases, and that her safety, comfort and life required the presence and attendance of her husband. The court thereupon excused the said juror, and the defendant excepted. After said juror had been discharged, the defendant then and there moved the court to discharge him; which motion was overruled by the court, and the defendant excepted."

The prosecution proved the facts connected with the finding of the dead body of May, and adduced testimony to show that she was last seen on Monday night, in company with her father, on the "Dummy Line" running to East Lake; also, proved the defendant's declarations to different persons, that he had sent his little girls to the convent in Mobile, had procured a divorce from their mother, and was to be married again, on Wednesday, in Mississippi, and had engaged rooms in a boarding-house for himself and his bride; also, the search of his house by police officers, the appearances indicating that a bloody struggle had taken place there, and other suspicious circumstances, which induced the search for the bodies of Mrs. Hawes and Irene, and resulted in their discovery. The defendant objected "to each and every part of the testimony showing, or tending to show, the death of Mrs. Hawes and Irene, and any and all circumstances connected with their death;" and he excepted to the overruling of these objections.

The prosecution offered in evidence "what purports to be a transcript of the bond and marriage license authorizing the marriage of R. R. Hawes and May Storey, with the return of the officiating minister, which is certified to by

J. T. Armstrong, clerk and notary public." The license was issued on the 5th December, and the minister's return stated that the marriage was celebrated on that day. The certificate of the clerk was in these words: "I, J. T. Armstrong, clerk of the Circuit Court in and for said county [Lowndes], and *ex officio* a notary public, certify that the above and annexed pages contain a true and perfect copy of the original affidavit, bond, marriage license, and official certificate of minister, as the same appears of record in my office. Witness my hand and seal," &c. The defendant objected to the admission of this transcript as evidence, " as being irrelevant, illegal, and incompetent," and he excepted to the overruling of his objection. The State offered in evidence also, in this connection, the Revised Code of Mississippi of 1880, which purports on its face to be published by authority of the State, and which was admitted to be "the last Code of that State;" and particularly sections 1148-9 and 1492, as therein contained. The two former sections relate to the issue and return of marriage licenses, and the last (1492) makes the clerk of the Circuit Court " the legal custodian of the records and papers relating to marriage licenses and certificates of marriage." The defendant objected and excepted to the admission of this Code as evidence.

J. T. Glover was introduced as a witness for the State, and testified, "that he was clerk, confidential clerk, in the office of Hewitt, Walker & Porter; that he knew Dick Hawes, and first saw him early in September; that Hawes came into the office, and asked him if he was a lawyer, and he answered that he was not; and that Hawes said the object of his visit was to get a divorce." The defendant objected to "any evidence by said Glover showing any conversation between him and witness concerning a divorce proceeding, because witness was a confidential clerk of the law firm whom defendant went to consult;" which objection was overruled, and the defendant excepted. The witness continued: "Hawes said he wanted a divorce as soon as he could get it. Mr. Porter came in, and witness had no further conversation with defendant. Nothing was said to him by Hawes about where his wife was, but he did say that he had instituted proceedings of divorce in Atlanta two or three years ago, and wanted to know if they could be continued here." The defendant then moved to exclude from the jury " the whole of the testimony of this witness, on the ground that it was a privileged and confidential *mission*;" and he excepted to the overruling of his motion.

[Hawes v. The State.]

J. I. Glover, a police officer, was introduced as a witness for the defense, and testified: "I have known defendant about eight years; he bore a good reputation; never knew him to have any difficulties; he was a peaceable, quiet man. I knew Mrs. Emma Hawes for fifteen years; don't know her general character for inebriety; her general character for virtue was not very good for the last two or three years." On cross-examination: "I have heard for the last few years that he frequently had difficulties with, and struck his wife." The defendant objected and excepted to this last statement as evidence.

Other exceptions were reserved by the defendant to the rulings on evidence, some of which are noted in the opinion of the court, but they require no further statement of facts.

The court thus charged the jury, as to the different degrees of felonious homicide: "There are four degrees of felonious homicide: murder in the first degree, murder in the second degree, manslaughter in the first degree, and manslaughter in the second degree. Murder in the first degree is any willful, deliberate, malicious, and premeditated killing of a human being. *Willful* means, governed by the will; without yielding to reason. *Deliberate* means, formed with deliberation, in contradistinction to a sudden, rash act. *Malicious* means, with fixed hate, or done with wicked intentions or motives; not the result of sudden passion. *Premeditated* means, contrived, or designed previously. The law fixes no particular length of time these elements shall be shown to have existed in the mind. If they co-exist but a moment before, and prompt the fatal act, it is sufficient. There must have been a previously formed purpose to take the life of the person slain, and death must be the result of the voluntary, intentional employment of means calculated to produce it. Murder in the second degree is the unlawful and malicious killing of a human being. The distinction between the two degrees of murder is the deliberation and premeditation which characterizes murder in the first degree. Manslaughter is the unlawful killing of a human being, without malice, either expressed or implied. You will observe that in manslaughter the ingredient of malice is wanting. Manslaughter by voluntarily depriving a human being of life, is manslaughter in the first degree; and manslaughter committed under any other circumstances, is manslaughter in the second degree."

The defendant excepted to this part of the charge given

[Hawes v. The State.]

by the court, and he also excepted to the following portions: (1.) "The State claims, that the deceased came to her death on Monday night, Dec. 3, 1888; that the defendant was seen that night at the house of Fannie Bryant" [a negro woman, who was implicated in the murders, was indicted, tried, and sentenced to the penitentiary for life, after the trial in this case], "where he called for the deceased, and went in the direction of the dummy; that a few minutes afterwards they boarded the Highland Avenue dummy at Lakeview, a short distance from Fannie Bryant's house, and came on the dummy to this city [Birmingham], and were seen to get off; that a short time afterwards, on the same night, they were seen on the East Lake Dummy Line, travelling in the direction of East Lake, where they got off at the pavilion; that he was seen, within an hour afterwards, on an East Lake dummy, coming in the direction of Birmingham, without the deceased, and alighted from the dummy in the city; that the defendant's conduct and declarations show that he had a motive to commit the crime; that the defendant's wife and other daughter, Emma and Irene Hawes, came to their death near the same time, in substantially the same manner, under circumstances tending to show that they were murdered by the defendant; that the murder of the deceased was part of a general plan, or scheme, formed by the defendant to rid himself of these three members of his family. This is a brief statement of the theory of the State." (2.) "The defense claims, on the other hand, that the defendant was not at Fannie Bryant's house on Monday night, and was not on the Highland Avenue dummy with the deceased that night, but was on the Saturday night before; that he then came with her to this city, from his home, in order to make some purchases preparatory to taking her to a convent in Mobile on the next day; that he returned home with her on the same night, between eight and nine o'clock; that he came back to the city about nine o'clock that night, with his little son Willie, in order to send him to Atlanta; that at this time Mrs. Emma Hawes, and May and Irene, were at home; that he returned home that night, between one and two o'clock, and found the door of his house open, and his family gone; that this was the last time he saw any one of these members of his family alive; that he was not on the East Lake dummy on Monday night, and was never at East Lake in his life but once, and that was three or four months before the death of May; that he has shown that it would have been impossible

for him to have been at the scene of the crime—in other words, that he has proved an *alibi*; that his conduct has been entirely consistent with his innocence, and he has made no declarations or admissions tending in any manner to criminate him; and that the State has failed to show either motive or opportunity to commit the crime."

The defendant requested the following charges in writing, and duly excepted to the refusal of each:

(1.) "When each of you was examined as to your qualifications as jurors, whether you had a fixed opinion against capital or any penitentiary punishment, or whether a conviction could not be had on circumstantial evidence, this question the court was required to ask you by statutory provision (Code, § 4333); but this qualification or oath which you have taken, as to your qualifications, in no way restricts or interferes with your right [to decide?] as to the amount, sufficiency or degree of proof required by you and each of you to find the defendant guilty beyond all reasonable doubt."

(2.) "The amount, sufficiency and degree of proof on circumstantial evidence in this case, is purely a question for the jury, and is not limited or restricted in any way whatever by questions asked as to your qualifications as jurors."

(3.) "If the defendant knew that he was actually divorced, or honestly thought that he was divorced, at the time of his last marriage; then the presumption of law would be, that his motives were innocent in contracting his second marriage."

(4.) "If, from the evidence in the case, you have a reasonable doubt whether the defendant was actually divorced from his first wife, or honestly believed that he was divorced, at the time of his second marriage, the law presumes him innocent of any wrong motive or intent in contracting the second marriage."

(5.) "As jurors, you have the right in weighing the evidence, and in considering all the questions arising in the case, to take into consideration all the facts, circumstances, and surroundings of the defendant; you have the right to take into consideration the fact that the deceased was the child of the defendant; and the law presumes that a parent has an affection for his own offspring, and that, instead of doing her harm, he would rather protect her from injury."

(6.) "The law entertains no presumption against the course of nature; on the contrary, it is a strong presumption

of the law, that nature will take its usual course, and that the defendant, being the father of the child for whose murder he is here indicted, bore no malice or ill-will towards the child, but, on the contrary, that he bore towards her the love which is natural for a parent to bear towards his offspring, and that in danger he would rather protect and take care of her than do her harm."

(7.) "The law presumes the defendant is innocent of this crime; and in addition to the usual presumption of innocence, the law also presumes that the defendant did not kill or have anything to do with the killing or injuring of the deceased, if the evidence shows that she was his own child."

(8.) "The law presumes that the defendant was legally divorced at the time of his second marriage, and this presumption stands in his favor until the contrary is shown."

E. T. TALIAFERRO, for appellant.—1. The court erred in overruling each of the three applications for a change of venue—Code, 4485. That the first application ought to have been granted, can not be seriously questioned, nor can there be any doubt of the public prejudice then existing against the prisoner throughout the entire community. He was required to make his application "as early as practicable before the trial," under penalty of forfeiting the right; and the improper refusal of it "may be reviewed and revised on appeal." The doctrine of error without injury, if applicable in any criminal case (*Mitchell v. State*, 60 Ala. 35), can not prevail here, in view of these statutory provisions. But there was equal error in overruling each of the other applications. On the undisputed facts shown by the record, the notoriety of which commands judicial notice, the court must know that it was impossible for the defendant to obtain a fair and impartial trial in the county. A stronger showing for a change of venue could not be made, and was not made in any of the adjudged cases.—*Seams v. State*, 84 Ala. 410; *Washington v. State*, not reported; *Ex parte Chase*, 43 Ala. 304; *Posey v. State*, 73 Ala. 494; *Birdsong v. State*, 47 Ala. 74. The general principle ought to be declared, that an attempt to execute "mob law" on an accused person, even though it may not result in a riot requiring military interference, is good and sufficient cause for a change of venue.

2. The indictment ought to have been quashed, because the record shows that the grand jury was summoned to serve for one week only, and that the indictment was not returned into court until a subsequent week.

3.   The original *venire*, or order for the summoning of the petit jury, ought to have been produced on the defendant's demand.   He had a right to inspect every paper, record, or minute-entry, connected with the proceedings against him, in order to see whether he had been deprived of any constitutional right; and his counsel stated, in making the demand, that he expected to show there was no original.

4.   The court ought to have asked the juror Penn the question suggested by counsel, as testing his competency. Counsel did not ask the question, in the nature of cross-examination, but asked the court to make the inquiry; and the question itself was proper.

5.   The discharge of the juror Gordon, on account of the sickness of his wife, was without authority of law, and entitled the defendant to an absolute discharge, as the juror was excused without his consent.—Code, § 4453; Const. Ala., Art. 1, §§ 7, 10; *Ned v. State*, 7 Porter, 189; *Williams v. State*, 3 Stew. 354; *Johnson v. State*, 32 Ala. 584; *Raiford v. State*, 7 Porter, 101; *Bell v. State*, 44 Ala. 393; *Cook v. State*, 60 Ala. 39; *Mahala v. State*, 10 Yerger, 533; *Lee v. State*, 26 Ark. 261; *Com. v. Cook*, 3 Serg. & R. 57; *Com. v. Clue*, 3 Rawle, 498; *Com. v. Tuck*, 20 Pick. 356; *Clark v. State*, 23 Miss. 261; *State v. McKee*, 1 Bailey, S. C. 651; *Lindsay v. Com.*, 2 Va. Cases, 345; *Wortham v. Com.*, 5 Rand. 669; *Com. v. Wheeler*, 2 Mass. 172; *U. S. v. Stowell*, 2 Curt. C. C. 153, 170; *State v. Thornton*, 13 Ired. 256; *State v. Thompson*, 3 Hawks, 613; *Rex v. Wade*, 1 Moody, 86; *Newsom v. State*, 2 Kelly, 60; *Reynolds v. State*, 3 Kelly, 53; *Durham v. State*, 9 Ga. 306; 2 Dev. & B. 162; 1 Dev. 491; 2 Hayw. 241; Cooley's Const. Lim., § 327; Bish. Crim. Law, 856.

6.   The defendant was under indictment for the murder of his wife and daughter Irene, but was on trial in this case for the murder of his daughter May.   The cases were separate and distinct, and evidence relating to the other cases could only operate prejudicially to the defendant.

7.   The paper which purported to be a certified copy of the bond, marriage license, &c., in Mississippi, ought not to have been admitted as evidence, because it was not certified as required by the act of Congress.—1 U. S. Stat. at large, 122.   The Alabama statute, relied on by the prosecution, can have no extra-territorial operation.—1 Doug. 170; 1 Esp. 533; 3 Esp. 190; Taylor on Evidence, 1055; *Chandler v. Hanna*, 73 Ala. 390; *White v. Strother*, 11 Ala. 720.   The

[Hawes v. The State.]

proof of marriages is guarded with great care in all civilized countries, because of the important results involved, and the ease with which false evidence may be fabricated.

8. The testimony of J. T. Glover ought to have been excluded, because it related to a confidential communication. 1 Greenl. Ev. §§ 239-40; 3 Wend. 337; 1 Peters, C. C. 356; 2 Stark. 239; 16 N. Y. 180.

9. The other points reserved are submitted without argument, and without the citation of authorities.

Wm. L. Martin, Attorney-General, for the State.—1. The trial was had nearly five months after the commission of the crime of which the defendant was accused, and when the community had recovered from the shock produced by its atrocity. The right to a change of venue is given in order to insure a fair trial; and if the affidavits submitted for and against it do not show a clear case, there is no error in refusing the application; the appellate court must be able to see, and see clearly, that the refusal was wrong.—*Edwards v. State*, 49 Ala. 334; *Seams v. State*, 84 Ala. 411. A crime such as this necessarily arouses public attention, and every one seeks information from the newspapers, and other publications, and desires to see the perpetrator brought to trial and punishment; but this does not show undue prejudice against the person accused, nor render them incompetent as jurors. A careful perusal of the affidavits submitted will suffice to show that the excitement against the defendant had subsided, and that a change of venue was properly refused. *People v. Goldenson*, 19 Pac. Rep. 461; *Com. v. Wright*, 33 Grat. 880; *State v. Rhea*, 25 Kans. 576; *State v. Adams*, 20 Kans. 311; *State v. Bolan*, 15 Kans. 407; *State v. Williams*, 3 Stew. 454; *Spies v. People*, 122 Ill. 1. The record shows that a jury was obtained without difficulty, and this is a fact tending to support the correctness of the court's rulings.—*Wright v. Com.*, 33 Grat. 880; *People v. Plum*, 9 Cal. 298; *Hunter v. State*, 43 Ga. 483; *State v. Rhea*, 25 Kans. 576.

2. The juror Gordon was properly excused. The statute does not specify all the cases which authorize the discharge of a juror.—Code, § 4453; *Com. v. Fells*, 9 Leigh, 613; *Davis v. State*, W. Va., 7 S. E. Rep. 24.

3. The witness Glover was not an attorney, and his testimony was not as to a privileged communication.—Weeks on Attorneys, 144.

4

[Hawes v. The State,]

4. The certified transcript from Mississippi, and the Revised Code of Mississippi, were properly received as evidence.—Code, § 2780; *Clanton v. Barnes*, 54 Ala. 260; *Walton v. Atkinson*, 84 Ala. 592; 1 Greenl. Ev. § 484; *Lynes v. State*, 36 Miss. 617.

5. The evidence connecting the defendant with the commission of the other murders, for which indictments were pending against him, was relevant to the question of motive. *Gassenheimer v. State*, 52 Ala. 313; *Hobbs v. State*, 75 Ala. 1; *Robinson v. Com.*, 146 Mass. 571; 44 Amer. Rep. 299, note.

6. The juror Penn had been examined by the court, and declared competent. Asking any other questions was, at least, matter of discretion.—*Bales v. State*, 63 Ala. 38; *Brooks v. State*, 92 Mo. 542; *Penn v. State*, 62 Miss. 450.

7. There is no merit in the other exceptions reserved.

McCLELLAN, J.—Three applications for a change of venue were made in this case, and denied by the court. The first was filed on January 24, 1889, the second on the 8th of February, and the third on the 22d of April. The first was overruled on January 28th. The second was passed until April 23d, and, on that day, it and the third application were severally and successively refused. Separate exceptions were reserved by the defendant to the action of the court in each instance. The first application, with its exhibits, was, by reference and adoption, made a part of the second; and both the first and second, with the exhibits thereto, respectively, were, in like manner, made a part of the third. By agreement of counsel, all the affidavits and exhibits which had been filed in support or denial of former applications, as well as such applications themselves, were " taken and considered with the last application as a part of the proceedings thereunder." The appellant now severally assigns as error the overruling of the two first applications, as well as the last, and insists that, if the action of the court below was erroneous in either particular, he is entitled to a reversal.

This presents a new question, and one not wholly free from difficulty. The statute provides, that the application "must be made as early as practicable before the trial, or may be made after conviction, on a new trial being granted; and the refusal of such application may, after final judgment, be reviewed and revised on appeal." This language clearly

contemplates the reservation of an exception whenever the occasion for it arises, regardless of the time at which the trial is subsequently had; and doubtless an exception, properly reserved at the time at which a change of venue is refused, and made a part of the record by a bill of exceptions taken as of that term of the court, would ordinarily be available on appeal from a final judgment thereafter rendered. Such was the state of facts involved in the case of *Hussey v. State*, 87 Ala. 121; and though no issue was made on the point, the objection was treated as being well taken at a term of the court prior to the trial. But the subsequent interposition of another or other applications and action upon them complicate the question. What then becomes of the exception first reserved? Does it still infect the record, in such manner that whatever action may be taken on the subsequent motions, and however correct such action may be in itself, the final judgment will be reversed, if this court concludes that, on the facts then presented, the first motion should have been granted? Suppose such an application is supported by proof of violent, all-pervading and bitter prejudice in the county against the defendant, yet is denied, and an exception is lodged in the record; and years after the case coming on for trial, another application is made; the proof is conclusive and overwhelming to the effect that all prejudice and bias against the defendant has entirely subsided, and, even, has been replaced by general sympathy for the defendant and belief in his innocence; and this application is denied, and a trial is had, of the fairness and impartiality of which there is no sort of question; would this court reverse a judgment of conviction, because of the denial of the first motion, though fully convinced of the propriety of the second denial, and the fairness and impartiality of the trial? Or, to further illustrate, suppose the first motion is improperly refused, the exception duly taken and injected into the record; the next day, or at a later hour of the same day, another motion is made and granted, the trial is removed to another county, of defendant's own selection, and he is there tried and convicted; can that conviction be avoided and annulled, because of the court's refusal to grant the first application? We apprehend not. The end of the law is to secure a fair and impartial trial.

When an application is made for a change of venue, because such a trial can not be had in the county of indictment, that application is improperly refused, and, without subse-

quent motion in that behalf, the defendant at any later time is tried and convicted, that judgment will be reversed. But if, after such erroneous refusal, the defendant again applies for a removal of his case, he thereby opens up the whole matter, invokes a trial *de novo*, and waives the infirmity of the record resulting from the first denial. The second hearing is in the nature of a new trial of the specific issue; and the defendant's assault upon the finding of the court in that issue must fail or succeed as error has or has not been committed on that hearing, just as error committed on a re-trial, and not that infecting the former trial, is alone available to reverse the second judgment. To hold otherwise would lead to inextricable confusion and embarrassment, and result, not infrequently, in defeating the avowed purposes of the statute. This construction involves no curtailment of a defendant's right to apply for a change of venue as often as he may deem advisable, and secures to him a removal of his trial in all cases when, in the judgment of the court below, or this court on appeal, he was entitled thereto at the time of his last application. Applying these views to the present case, it follows, that only the action of the Criminal Court of Jefferson on defendant's third and last application will be reviewed. In discharging this duty, we shall confine ourselves strictly to the case made before, and passed on by, the primary court. We enter upon the inquiry, indulging the presumption that the proceedings of the lower court are free from error. Before its action will be reversed, this court must see affirmatively that error has been committed. It is not enough that it may not clearly appear the ruling below was right, or that we, acting as a court of original jurisdiction, would have hesitated to have decided as the primary court has decided, but we must see, and see clearly, that its action was wrong.—*Edwards v. State*, 49 Ala. 334; *Lewis v. Teal*, 82 Ala. 288; *Spivey v. Almon, Ib.* 378; *Ex parte Nettles*, 58 Ala. 268.

[3.] The question, then, is: Did the Criminal Court err in overruling defendant's third application for a change of venue? The evidence in support of that application consisted of three several affidavits of the defendant himself, to which, and as a part of which, were exhibited sundry excerpts from newspapers published in Jefferson county, and a small book, entitled "The Hawes Horror;" the affidavits of E. T. Taliaferro and Wm. Vaughan, defendant's attorneys, and the affidavits of five other citizens of the county. Each

[Hawes v. The State.]

and all the affidavits of the defendant himself are as strong, perhaps, as language could make them, to the effect, in general terms, that he could not have a fair and impartial trial in the county. They give an account of the state of public feeling immediately after discovery of the crime, which was characterized by open and violent threats against him, and which culminated on December 8, 1888, in an assault on the jail by a large mob, with the avowed purpose of putting him to death. They allege that this state of public feeling was engendered by newspaper publications, and was kept alive, and deepened and embittered, subsequent to the riot at the jail, by other newspaper publications, and the book referred to above, all of which were largely circulated and read in the county. All of these publications, he avers, were either absolutely false, or so exaggerated and distorted and denunciatory of him, that the public mind was inflamed and excited against him, and so continued to the time of the trial. He further gives an account of the assault on the jail, and its bloody repulse, involving the death of twelve or fifteen citizens, and the serious wounding of as many more; and affirms that this terrible calamity intensified public sentiment against him, in such sort that it was necessary to his protection from mob violence to have the jail guarded for nearly a week thereafter, by a large body of State troops, &c., &c.

We have given a very careful examination to the several publications exhibited to defendant's application. We fail to find in them any denunciation of the defendant calculated to arouse public resentment. They contained no undue assumption of his guilt, but, on the contrary, treat it as an open and disputed question. Nothing appears to have been stated for the purpose of arousing indignation, or tending to create prejudice, except in so far as the publication of the facts and circumstances of the murder as they were developed might have had that effect; and in stating the facts there appears to have been no disposition to suppress whatever was favorable to defendant. The statements may have been, more or less, overdrawn; and it would have been very strange if they had not been so, in view of the occasion and the circumstances under which they were made. They were, however, such publications only as papers all over the country are accustomed to make under like surroundings; and we do not doubt but the matter contained in them reached the public, with a very much greater approximation to the exact truth, then if it had passed from mouth to mouth, and

thus been disseminated among the people. The publication down to, and for several days after the jail shooting, show, beyond all question, that there was, during that time, widespread and intense excitement and prejudice among the people of Birmingham and vicinity against the defendant. It is immaterial how this state of things was produced. Its existence alone concerns us. And its existence at that time is not seriously controverted by the State, though there is evidence in these exhibits, and in the affidavits offered by the prosecution, tending to show that the excitement was ephemeral in its nature,—as, for instance, that intoxication was not an unimportant factor in the condition of things which precipitated the assault on the jail, and that by the result of that assault public feeling was diverted from the defendant, and directed against the officers who defended the jail, in such manner that it was said, "in an instant Hawes and his murdered wife and children were forgotten, and the excitement and fury of the people were directed against sheriff Smith," and confined to a certain class "of rash and excitable men, who do not constitute the juries of the county."

Did this excitement and resentment continue down to the trial? It may be remarked in the outset, that the conditions for its continuance were much less favorable in a large and rapidly increasing population, like that of Birmingham and Jefferson county, than they would have been, perhaps, in any other county of the State. The publications made subsequent to the disturbances on and about December 8, 1888, were not calculated to keep it alive, but, on the contrary, their tendency was to excite sympathy for Hawes, and doubt of his guilt, rather than prejudice against him, and assurance that he was the perpetrator of the atrocious crimes. Neither these publications nor anything else shows, or tends to show, a renewal at any time, or any disposition to renew, mob violence. The defendant swears that prejudice against him not only continued, but grew more bitter against him. Pretermitting the infirmity of interest which naturally infects his testimony, it is manifest that he was not in a position to know much about the state of the public mind, and for this reason, of itself, what he says is entitled to very little weight, except in so far as he is corroborated by other testimony. Messrs. Taliaferro and Vaughan, and five other witnesses— seven in all—affirm the continued existence of violent and bitter prejudice against the defendant, to such an extent that he could not possibly get a fair and impartial trial. They

speak from their knowledge of public sentiment, derived from conversations with very many citizens of the county. The attorneys say they have been unable to secure more affidavits, because very many persons to whom they have applied, while stating that they did not believe an impartial trial could be had, yet refused to make affidavit to that effect, lest the enmity against Hawes should be visited on them also. Against this showing of prejudice on April 23d, 1889, the State filed the affidavits of sixty-five citizens of the county, who show they had ample opportunity to know the condition of the public mind at that time, on the subject under inquiry. Among them were officers of the county, necessarily much in contact with the people, newspaper men, bankers, physicians, mechanics, farmers, railroad men, contractors, merchants, mine operators, &c., &c. They represent all classes and avocations, and come from the various sections of the county. Their evidence is not of the character held of little consequence in the case of *Seams v. State*, 84 Ala. 410. They do not give their opinions merely. They state facts within their knowledge, as to public sentiment in the county of Jefferson, and they give the sources of their information. They swear they have been thrown in contact, and have conversed about the Hawes cases, with very many people—in some instances "hundreds," in others, "many hundreds," in yet others, "thousands"—from all parts of the county. They give the expressions of these people, showing their own and the public sentiment and feeling in regard to the defendant, his guilt or innocence, and his trial. They state the expressions of these very many people on minor matters and facts tending to show public sentiment. They give the opinion of these very many people, based upon their own knowledge of the public mind, as to whether the case can be fairly and impartially tried in the county. All these expressions and indices as to public sentiment are to the effect, that whatever feeling at one time existed to prevent a fair and impartial trial had subsided, abated, and been dissipated, and that there was no such feeling or prejudice at the time of the affidavits as would prevent such a trial. And from their own knowledge of public sentiment, derived from these sources, these affiants swear that the excitement and prejudice existing against the defendant soon after his arrest had been allayed, that it did not exist at the time of the trial, and that defendant could then have a fair and impartial trial.

Here, then, was the case upon which the judge of the Criminal Court acted. The defendant showed excitement and prejudice against him early in December, 1888, which, under the rulings in *Seams' Case, supra*, would then have entitled him to a change of venue. Seven reputable witnesses testify, from their knowledge of public sentiment, that this excitement and prejudice continued to the time of the trial, in the latter part of April, 1889, and then infected the proceedings. *Per contra*, sixty-five reputable witnesses, with apparently better opportunities of knowing whereof they speak, testify from their knowledge of public sentiment, that this excitement and prejudice did not continue to, and did not exist at the time of the trial; that a fair and impartial trial could be had, and the result of it would be cheerfully accepted. On this showing the final application was denied. The authorities support the conclusion reached by the court below. The inquiry related necessarily to the time of the trial. *Greer v. State*, 22 W. Va. 800.

The denial of motions for a change of venue, under the circumstances shown here, and on evidence similar to that presented in this record, has been universally sustained in the courts of last resort in other States. Thus, in *Poe v. State*, 10 Lea (Tenn.), 673, it appeared that, "when the prisoners were first arrested, in February, 1881, the people living in the vicinity of the place where the crime was committed, were inflamed against the prisoners, and mob violence was threatened; · · · · nothing of the kind occurred, or appears to have existed, at the time of the trial. All excitement had died out, a jury was readily impanelled, and a verdict was rendered in the usual way." The refusal of a change of venue was held proper. So, in *State v. Rhea*, 25 Kansas, 576, the application was supported by the affidavit of defendant, alleging prejudice, and setting out sundry newspaper articles published in the county, containing statements of facts similar to those disclosed on the trial, and severely denouncing the defendant; and also by the affidavit of one of the party which was engaged in the search for defendant, to the effect that public feeling was very bitter and denunciatory against him. There were twenty-one counter affidavits, denying general prejudice against defendant; and the refusal of the application was sustained. And in the case of *State v. Adams*, 20 Kansas, 311, the application was supported by "the affidavits of *seventeen* persons, all showing more or less acquaintance with public opinion, and some

[Hawes v. The State.]

alleging that they had heard frequent threats against the defendant, and all expressing the opinion that there was such a prejudice against him as would prevent a fair trial. In opposition thereto, the State filed the affidavits of *nineteen* persons, showing fully as great, if not greater knowledge of the general talk and sentiment of the community, and expressing the opinion that there was no such prejudice against him, and that there was no reason why he could not obtain a fair and impartial trial. Without noticing in detail all the matters contained in these affidavits, says Justice Brewer, "We may say, in general, that a perusal of them inclines us decidedly to the opinion, that the ruling of the court in refusing the application was correct;" and it was so determined.

In *Bohan's Case*, the application appears to have been rested on the existence of a "prejudiced, embittered and poisoned" state of the public mind, which had been engendered by the killing of two men, and *overdrawn and inflammatory newspaper accounts of the crime*, and evidenced by the fact that a *lawless mob had attempted the life of the prisoner, and had attacked the jail of the county* in their efforts to summarily punish him. The application was supported by the affidavits of the prisoner, the sheriff and the jailer, and excerpts from the newspapers. "These affidavits," says Kingman, C. J., "made out a *prima facie* case for removal; but the State read a great number (over ninety) affidavits from citizens of each of the townships of the county, showing that there was no such state of feeling generally prevailing throughout the county as would prevent the accused from having a fair and impartial trial therein, or would even make it difficult to obtain an impartial jury for the trial." And the action of the lower court, denying the motion for a change of venue, was affirmed.—*State v. Bohan*, 15 Kansas, 407.

But perhaps the strongest case in support of the action of the Criminal Court of Jefferson, to be found in the books, is that of *People v. Goldenson*, decided by the Supreme Court of California. The defendant, himself a youth, had causelessly and wantonly murdered a girl about fourteen years of age. The showing made for a change of venue, and the reasons of the court for sustaining a denial of the motion, are thus stated by Patterson, J.: "In support of their motion for a change of venue, counsel for defendant made what appears to be a very strong showing. It appears from the

affidavits that, within a few days after the homicide had occurred, a crowd assembled in front of the house of said defendant, and some of them cried out, "Close him up;" "Make the Jew close up;" "Hang him;" "Lynch him;" that a guard of police was necessary at that time to protect the property of defendant's family; that for several days defendant's relatives feared to leave their home; that the shutters and window of affiant's store were broken by some of the excited people gathered there; that on the occasion of the attempted removal of defendant's family, some of their property had been injured; that for several days succeeding November 10, 1886, many people remained continuously in the vicinity of defendant's home, uttering threats of violence against defendant and his family; that the newspapers in said city and county were daily denouncing said defendant, and demanding his immediate execution; and that for the reasons given it was impossible for defendant to receive a fair and impartial trial in said city and county. Mrs. Goldenson, the mother of defendant, incorporated in her affidavit clippings from the newspapers describing a meeting which took place in Metropolitan Hall on November 12, 1886. It appears from said articles that said meeting was held for the purpose of raising money for the mother and grandmother of the deceased, and to engage counsel to assist in the prosecution of the defendant, but that many turbulent acts and threats of mob violence were indulged in by members of said meeting; that on the night of said meeting, the sheriff and chief of police had the jail, where the defendant was confined, guarded by a large force of men, well armed, and precautions had been taken against any unlawful assault or attack; that about 8:30 o'clock of the night in question, several thousand people assembled in front of said jail, and many appeals were made for immediate violence; and that finally the crowd was driven away by a determined effort of a large force of police, but not until many blows had been given and interchanged. It further appears from the affidavits first quoted, that an attempt to remove their property on November 13th was frustated by the offer of violence; that on November 16th, under the protection of the police, a removal was effected; that affiants had read highly inflammatory articles in the papers calling for the speedy trial and execution of defendant, and had heard many bitter and hostile expressions of opinion by citizens towards said defendant.

[Hawes v. The State.]

"If this condition of affairs existed at the time of the trial, it must be admitted that the city of San Francisco was not a proper community from which to attempt to select a fair and impartial jury for the trial of the defendant. When the public mind is wrought into such frenzy, and the public press sustains enraged citizens, organized for avenging crime, in their unlawful attempts to overcome the duly constituted officers of the law, and only the superior force of the latter prevents mob execution, no man whose blood is thus demanded can hope to secure the rights guaranteed to him by the constitution. It is impossible, under such conditions, to secure equal, exact and impartial interpretation and execution of the laws, which is not only the right of every person, but which is essential to the welfare of all and the conservation of good government. But, while the facts stated in the affidavits on behalf of the defendant are admitted to be true substantially, there are two sufficient reasons why the order of the court below denying the motion for a change of venue should not be disturbed: 1. Because the principal occurrences, upon which affiants for defendant based their belief that a fair and impartial trial could not be had, transpired within a few days after the homicide, and the counter-affidavits filed by the prosecution tended to show that the excitement which had been aroused by the homicide had entirely subsided, and had not prevailed for three weeks prior to the time of the application for a change of venue. We can not say that, under the showings made by the respective parties, the court abused its discretion in denying the motion. Such applications are addressed to the sound discretion of the court, and where error is assigned, a clear case should be shown by the record, or this court will not interfere."—*People v. Goldenson*, 76 Cal. 328; s. c., 19 Pacific Rep. 161.

The excitement in Goldenson's case appears to have been even greater than that shown to have existed in Birmingham on the 8th of December. The newspapers were inflammatory and denunciatory, which they were not in this case. Bitter feeling and prejudice are even more clearly shown to have existed immediately after the crime in that case than in this. A much shorter time elapsed between the date of the crime and public excitement and the trial, there than here; there it was three weeks, here it was over four months. The proof of abatement and subsidence is very much stronger in this case than in that. All in all, that was a very much stronger

showing for a removal of the trial than is made here, and hence presented a very much stronger case for a reversal of the action of the primary court. We do not think we would, on that showing, have reached the conclusion which the California court reached, and hence we do not adopt the language we have quoted. But we do adopt the principle acted on by that court, that the existence of popular prejudice, however bitter and violent, at a given time, will not authorize a removal of the trial, if there has been time for the subsidence of it, and if the affidavits by a fair and reasonable preponderance show that the excitement, bias, and prejudice have subsided and been allayed, in such sort that it is fairly shown that a jury could and would be impanelled in the county, proceed with its deliberations, and reach its verdict free from the duress of public opinion, and undeterred from an acquittal of the defendant by the adverse sentiment of the community. Guided by this principle and the authorities cited, and looking alone to the evidence adduced on the trial of this issue before the judge of the Criminal Court of Jefferson, which each member of this court has carefully examined, we are of one mind, that it does not appear that he erred in overruling the application for a change of venue.

We have not been aided to this conclusion by a consideration of the fact that a jury, presumably free from bias and prejudice, was readily and easily obtained. That matter was not before the primary court when it acted on the motion, and hence not properly before us in reviewing that action. Moreover, the personal qualification of jurors is not the inquiry involved in the statute which authorizes a change of venue, so much as whether there is such a general public sentiment against the defendant as would tend to intimidate the honest and personally unbiassed juror, and deter him, even without his being conscious of the insidious influence, from acquitting the defendant, though he might have a reasonable doubt of guilt.—*Seams v. State*, 84 Ala. 410; *Posey v. State*, 73 Ala. 400; *Ford v. State*, 37 La. Ann. 443.

[4.] The court did not err in refusing to examine witnesses *ore tenus*, on the issue presented by the application for a change of venue.—*Taylor v. State*, 48 Ala. 180.

[5.] It is contended for appellant, that the action of the court in discharging the juror Gordon, after arraignment, plea, and the completion of the panel, and hence after the defendant had been put in jeopardy, was unauthorized and illegal, and operated to acquit him. The question as to

[Hawes v. The State.]

when and under what circumstances a juror may be discharged before deliverance made, without affording the prisoner protection from further · prosecution under the common-law guaranty, now embodied in the Federal and most, if not all, the State constitutions, that "no person shall for the same offense be twice put in jeopardy of life or limb," has been much discussed by able jurists, and many times with varying and inconsistent results, adjudged by the courts of this country and of England. The rule was thus announced by Lord Coke: "To speak it here once for all, if any person be indicted for treason, or of felony or larceny, and plead not guilty, and thereupon a jury is returned and sworn, their verdict must be heard, and they can not be discharged." Without impugning the doctrine thus stated, as a correct general rule, it became apparent, at an early day, that, in the nature of things, it must be subject to many exceptions. · Perhaps the first of these to become established was that which allowed the discharge of the jury, without prejudice to further prosecution, when the judge had completed his circuit, and the court in the last county of his riding was adjourned, the jury in the meantime being carted after him through the circuit. Afterwards it was adjudged, upon full consideration by the judges *in banc*, that the prisoner's consent thereto would authorize the withdrawal of a juror, and a continuance of the prosecution; and in the case in which this exception was established, it was suggested that there might be several other exceptions, resulting from the impossibility of proceeding further with the trial. . And so, from time to time, other cases of necessity have been adjudged sufficient to authorize the discharge of a jury without verdict, and without the prisoner's consent. Each time a new exception to the rule has been admitted, it has been the custom of most courts to say that the additional exception thus allowed, with those theretofore established, constituted the *only* cases in which a jury could be discharged; and in this way not a few *dicta* have been lodged in the reports, which would exclude not only the discharge of a juror on account of the sickness of his family, but many other exceptions, which became afterwards to be well recognized. In this country there are two distinct lines of authority on the question. The Supreme Courts of the United States and of several of the States hold, that the discharge of the jury rests largely in the unrevisable discretion of the trial court. *United States v. Perez*, 9 Wheat. 579; *People v. Olcott*,

[Hawes v. The State.]

2 Johns. Cas. 301; *Commonwealth v. Purchase,* 2 Pick. 521; *State v. Spalmaker,* 2 McLean, 114. The courts of last resort of other States, and among them Alabama, hold that the exercise of the power to discharge a jury is not a matter of unbridled discretion in the primary court, but that its action in that behalf is always open to review on appeal or writ of error.—*Commonwealth v. Cook,* 3 S. & R. (Pa.) 57; *Mahala v. State,* 10 Yer. (Tenn.) 533; *Lee v. State,* 26 Ark. 261; *State v. Ephraim,* 2 Dev. & B. (N. C.) 162; *Ned v. State,* 7 Port. 189; *Nixon v. State,* 55 Ala. 129; *Cook v. State,* 60 Ala. 39.

In these jurisdictions, the discharge of a jury without verdict, and before the close of the court, or, at least, before impossibility of an agreement has been reasonably demonstrated, acquits the defendant, unless something has occurred after jury sworn, which in legal contemplation necessitates the withdrawal of the case. The facts presenting such necessity, recognized by all courts as authorizing the discharge of the jury, are the sickness of the judge (*Nugent v. State,* 4 S. & P. Ala. 72), or a juror (*Fletcher v. State,* 9 Humph. 249; *Rex v. Edwards,* 4 Taunt. 309; *Hector v. State,* 2 Mo. 166), or of the prisoner (*Brown v. State,* 38 Tex. 482; *State v. Wiseman,* 68 N. C. 203; *Lee v. State,* 26 Ark. 260), or the escape of a juror from his fellows (*State v. Hall,* 4 Halst. 256; *Reg. v. Ward,* 10 Cox, C. C. 573), or the escape of the prisoner (*Battle v. State,* 7 Ala. 259); and, it would seem, the sudden illness of the solicitor, unless he have assistants or associates, who can proceed with the case (*United States v. Watson,* 3 Benedict, 1).

In this State, the broad doctrine of necessity has been thoroughly established, and it may be considered as settled law, that whenever, from any cause, whether those enumerated above, or any other, the court is unable to proceed with the trial, and the jury with its deliberations, and such cause supervenes pending trial, and is of a nature not to be foreseen, and can not be removed, the court is authorized to discharge the jury, and hold the prisoner for further trial. In *Nugent's Case,* where the sickness of the judge was held to justify the discharge of the jury, after reviewing several of the grounds upon which the discharge of the jury is authorized, the court proceeds: "But, whatever should be the ground of the discharge of the jury, it should always be on the self-same principle of necessity. Otherwise, it would seem the prisoner should not be again put upon his trial.

[Hawes v. The State.]

. . . . The principle once settled, of necessity, we will only have to inquire if the exception is embraced by it; *and although the progeny may be numerous*, it seems to me there will never be much dfficulty in the application of the rule. All the authorities admit, that when any juror becomes mentally disabled, by sickness or intoxication, it is proper to discharge the jury; and whether the mental inability be produced by sickness, or fatigue, or incurable prejudice, the application of the principle must be the same." *Nugent v. State*, 4 Stew. & Port. 72. In *Powell's Case*, it is said: "The general rule, as laid down by the highest authorities on the criminal law, is, that a jury, once sworn and charged in a case affecting life or member, can not be discharged without giving a verdict. Amongst the exceptions to this rule is this: that a court may discharge a jury in any case of pressing necessity, and should do so whenever such a case is made to appear."—*Powell v. State*, 19 Ala. 577.

"The sudden illness of a juror, or of the prisoner, so that the trial can not proceed, are ascertained cases of necessity, and serve as examples to show what the law means by a case of necessity."—*McCauley v. State*, 26 Ala. 135.

In *Ned's Case*, *supra*, the following propositions were laid down, as being fully sustained by the authorities: 1. "That courts have not, in capital cases, a discretionary authority to discharge a jury after evidence given." 2. "That a jury is, *ipso facto*, discharged by the termination of the authority of the court to which it is attached." 3. "That a court does possess the power to discharge a jury, in any case of pressing necessity, and should exercise it whenever such case is made to appear." 4. "That sudden illness of a juror, or of the prisoner, so that the trial can not proceed, are ascertained cases of necessity; and that many others exist, which can only be defined when particular cases arise," &c., &c. And as further defining the necessity which will authorize the discharge of the jury, Mr. Justice Goldthwaite continues: "The law declares that every one shall be entitled to the benefit of a trial by jury, and as long as they continue in health, and capable of reasoning on his case, he is entitled to the exercise of those powers. Whenever, from exhaustion, or any other cause, a juror becomes unable to exercise these functions, and the fact is shown to the court to be such as must continue, then the case of necessity has occurred, and the jury ought to be discharged."—*Ned v. State*, 7 Port. 213.

In the case at bar, the necessity for discharging the juror

[Hawes v. The State.]

Gordon resulted from the sickness of his wife in such sort that her life, as the record shows, depended, in the opinion of the attending physician, on the personal attention of her husband, and, as the record further recites, the critical illness of the wife, and the necessity of her husband's presence to save her life, incapacitated the juror for the performance of his duties as such. We can easily conceive how this state of things might, and naturally would, have rendered the juror incapable of that calm and deliberate consideration and reasoning, which is of the essence of the office of juror, and for the absence of which, in any member of the panel, the jury should be discharged. As was said in *Parsons' Case*, "It certainly requires no argument to show, that if the wife or child of a juror is at the point of death, he would not be in a state of mind to discharge the duties which devolved upon him, with that degree of patience, coolness and deliberation, which is due in the investigation of cases of this magnitude and importance; and it would unquestionably be the duty of the court to discharge a juror under such circumstances." *Parsons v. State*, 22 Ala. 53. It is true, that the point thus discussed was not directly at issue in the *Parsons Case*, and hence the language we have quoted is *obiter dictum*. But it is in line with all previous adjudications in this State, defining the necessity which will authorize the discharge of a jury; and is but the heralding of another "of the progeny of the principle of necessity," as expounded in the earlier case of *Nugent v. State, supra*.

But we need not rest our approval of the primary court's action alone on the cases and considerations above adverted to. There is no case to be found in the books, which, in *dicta* or otherwise, expressly negatives the correctness of such action under the circumstances shown by this record. In one case, and one only, so far as exhaustive investigation by the court and counsel discloses, this precise question was fairly presented, and upon its decision hung the life of the prisoner. In that case it was held, that the *serious* sickness of the wife of a juror—an illness not shown to have been so critical as in the present case—presented a necessity for the discharge of the jury, without prejudice to further prosecution.—*Commonwealth v. Fells*, 9 Leigh (Va.), 613. And a strictly analogous case was decided by the West Virginia court, where it was held a necessity to discharge a juror was produced by the death of his son, and the effect upon his

[Hawes v. The State.]

mind of information of his bereavement.—*Davis v. State,* 31 W. Va. 390.

The case in hand is strengthened by the fact, that our statute authorizes the court to discharge a juror on account of his illness, or for any other cause, which, in the opinion of the court, renders it necessary.—Code, § 4453. And while the necessity must be of the class defined by the adjudged cases to which reference has been had, sudden, unforeseen by the court, irremovable, and incapacitating a juror, or the judge, or prisoner, or, under some circumstances, the prosecuting officer, from properly and efficiently discharging their duties, or attending to the trial; yet the statute is, at least, a legislative expression to the effect that the instances of such necessity are much more numerous than were formerly supposed by some courts. Enactments of this character have been held to authorize the discharge of a jury under circumstances which would not have justified that action at the common law (*Crookleave v. State,* 5 W. Va. 510;) but we apprehend to accord them this effect would be to incroach upon the constitutional protection against putting a defendant twice in jeopardy for the same offense.

[6.] The motion of the defendant to quash the indictment, on the ground that the grand jury which returned it was summoned for one week only, and the indictment was not returned until after the lapse of that time, was properly overruled. The record does not support the averment of fact upon which reliance was had. On the contrary, it affirmatively appears that the grand jurors were drawn and summoned "for the term," as the law requires. The words "to serve as grand jurors for the week," are inconsistent with and contradictory of the terms of the writ required by law to be issued, and which was issued in this case, and they were properly treated by the court below as surplusage.

[7.] The court did not err in overruling defendant's motion to quash the *venire.* In so far as that motion was predicated on the fact that the jurors for the trial of this case had been drawn and summoned under and in compliance with a statute passed after the commission of the offense, its denial is fully supported by the authorities.—*Lore v. State,* 4 Ala. 173; *South v. State,* 86 Ala. 617, *and cases cited.* The other grounds of the motion are rested on the mere fact, that the clerk had not written up the minutes of the primary court, and hence there was, strictly speaking, no *record* of the order for the special *venire.* The transcript before us

[Hawes v. The State.]

demonstrates, that the order, in due form, was made, and that a copy of it was regularly served on the defendant, as also a list of the jurors summoned under it, for his trial. The prisoner thus had every right which the law secures to him in this connection, and he was not, and could not have been, prejudiced by the temporary delay—not at all unusual in practice—of the clerk, in transcribing the order of the judge into the record of the court.

[8.] It is the duty of the court to ascertain whether jurors, examined on their *voir dire*, have the statutory qualifications, and, among other things, he should inquire of them whether they have, at the time of their examination, a fixed opinion as to the guilt or innocence of the defendant, which would bias their verdict. It is manifestly immaterial whether they, at any time, or for any length of time in the past, have had such opinion. We understand from the record, that this duty was fully performed with reference to the juror Penn; and he was declared to be a competent juror. Defendant's attorney then requested the court to propound to him the further inquiry, whether he had not before that time had a disqualifying opinion on the question of guilt *vel non*. We are unable to see what bearing, or any relevancy, the answer to this question could have had on the issue which the court was called on to determine. He was equally a competent juror, whether he answered yea or nay. The only end to be subserved by inquiry on this point, was to advise the defendant as to the expediency of peremptorily challenging the juror. Certainly there is no duty resting on the court to go into an inquisition, the sole purpose of which is to aid the defendant to determine whether he will challenge a juror peremptorily. But, even if it be conceded that an affirmative response to the question would have authorized a challenge for cause, the action of the court must still be held free from error. To require the court to enter upon such an investigation, would be even more objectionable, because involving a greater expenditure of time, than the practice condemned in *Bales' Case*, of allowing such examination directly by defendant's attorney. There it is said: "We know of no authority, and we perceive no reason, for any such speculative, inquisitorial practice, consuming needlessly the time of the court, and offensive to the persons subjected to it. The rule is ancient, that neither party has a right to interrogate a juror before he is chal-

[Hawes v. The State.]

lenged."—*Bales v. State*, 63 Ala. 38.    See, also, *State v. Brooks*, 92 Mo. 542; *Penn v. State*, 62 Miss. 450.

[9.]    The theory of the prosecution in this case, as developed on the trial, was, that the defendant conceived that the lives of Emma Hawes, his wife, and of their children, May and Irene, stood between him and the consummation of a second marriage; and hence that the motive which prompted the murder of each of them was the same.    There was evidence tending strongly to support this theory, and to show that the death of each one of the victims was but a part of a system in which the lives of all were involved, and in the working out of which to the accomplishment of defendant's ulterior purpose, the life of each was, in substantially the same manner, ruthlessly sacrificed.    Under these circumstances, all evidence going in any way to connect the defendant with the murder of his wife, or of his daughter Irene, was relevant to the issues involved on his trial for the murder of May, and was properly admitted.—*Lawson v. The State*, 20 Ala. 65; *Alsobrooks v. State*, 52 Ala. 25; *Gassenheimer v. State*, 52 Ala 313; *Cross v. State*, 78 `Ala. 430; *Ingram v. State*, 39 Ala. 247; *McDonald v. State*, 83 Ala. 46; 2 Bish. Cr. Pr. §§ 189, 235, 261, 327; *Com. v. Robinson*, 146 Mass. 571, and cases cited.

[10.]    The witness Cann, being called to prove a conversation he had with the defendant at the time of his arrest, testified that he was then acting as a reporter for the *Evening Chronicle*; that he made notes of the conversation, and from them wrote out an account of what was said for the paper; and that this account was published in the paper, after being cut down, and some parts of it being omitted.    It was shown that the notes, from which the article was written, had been destroyed.    Upon this showing, the witness was allowed to refer to and read the article as published, to refresh his memory in regard to what was said by the defendant at the time in question.    To this there was an exception.    We do not think it is tenable.    The article, as published, was written by the witness.    It contained, the witness swears, the substance of what the defendant said.    The question presented by the exception comes within the principle adjudged in the case of *Horne v. Mackenzie*, 6 Clark & Finnelly, 628, where a surveyor was permitted to refresh his memory by reference to a printed copy of his report, which had been made up from his original notes, of which it was, in substance, though not in words, a transcript; and in the case of

*Topham v. Macgregor*, 1 C. & Kir. 320, in which the writer of an article in a newspaper was let in to swear to the facts stated in the article, though he had no independent recollection of them, but swore that all the statements made in a series of articles, of which this was a part, were true. The same principle is negatively asserted in New York, where the court held, that the memory of a witness could not be refreshed by reference to an article which "*did not* purport to be, and was not in truth, a statement of a conversation with, or declarations made by the plaintiff," and which was *therefore* not competent for the purpose in view.—*Downs v. R. R. Co.*, 47 N. Y. 87; 1 Whart. Ev. § 522; Taylor on Ev. pp. 1198 *et seq.*; *Hickman v Acklen*, 63 Ala. 484.

[11.] It is a thoroughly well settled and familiar principle, that communications between client and attorney, or from any person to an attorney, with a view to establishing the relation of client and attorney, as to a particular matter, and securing professional advice or other aid in respect thereto, are privileged, and can not be put in evidence, unless the privilege be waived by the client. It is equally well established law, that an interpreter, intermediary, agent or clerk of an attorney, through whom communications between attorney and client are made, stands upon the same footing as his principal, and will not be allowed to divulge any fact coming to his knowledge as the conduit of information between them. But the rule extends no further than this. The reasons upon which it rests, the salutary objects sought to be attained by its observance, do not require that it should embrace communications made to an attorney otherwise than in securing or directing his professional services, or communications made to the agent or clerk of an attorney otherwise than for transmission to the attorney, or, at least, in and about and in furtherance of the discharge of the duties incident to the confidential relation. The privilege, in other words, is confined to communications between the attorney and his client, and extends to the necessary organs by which such communications are made, but no further.—Taylor on Ev. pp. 791, 792; 1 Green. Ev. §§ 239-40; Whart. Law of Ev. §§ 581, 582; *Taylor v. Foster*, 2 Car. & P. 195; *Mass v. Brander*, 1 Phil. 266; *Studdy v. Sanders*, 2 Dowl. & R. 347; *State v. Cotton*, 87 Ala. 75.

The privilege does not include communications made by one person to another, under the erroneous supposition that the other is an attorney (*Fountaine v. Young*, 6 Esp. 115);

[Hawes v. The State.]

and hence not where they were made to a law-student in the office of an attorney, although he represented himself, and was believed to be the attorney.—*Barnes v. Harris*, 7 Cush. 576. And on the other hand, the rule of exclusion manifestly would not apply to communications made by a person to an attorney, in ignorance of his professional character, and hence, necessarily, without any purpose of securing his professional aid. And it is equally clear, that communications made to a person who was in fact the agent or clerk of an attorney, but of which fact the other was not advised, could not have been confidentially imparted, or made with a view to their being repeated to an attorney, and are not privileged. The facts last hypothesized are precisely those involved in the admission of the testimony of the witness Glover, to which an exception was reserved. Glover was the confidential law-clerk of Hewitt, Walker & Por'er, attorneys. Defendant came to the office of that firm, and, finding the witness there, asked whether he was a lawyer. The witness replied in the negative. Then, without further inquiry, or any knowledge respecting witness' relations to the attorneys, and without evincing any desire or purpose to have witness communicate to them what he was about to say, he made the statements deposed to by the witness. Very clearly these statements were not privileged communications, and there was no error in admitting them in evidence.—Weeks on Attorneys at Law, §§ 143, 144.

[12.] The transcript of the record of the defendant's marriage in the State of Mississippi was not certified as required by the act of Congress for the authentication of the records of one State in the courts of another. The act of Congress, however, is not exclusive of any other method of authentication of public office books, which the courts may deem it proper to admit, or the States see fit to adopt. 1 Greenl. Ev. § 489; *Packard v. Hill*, 2 Wend. 411; *Lathrop v. Blake*, 3 Barr, 483; *Hempstead v. Reed*, 6 Conn. 480. And the inquiry is, whether Alabama has adopted a different mode of certification in respect to the record in question. Section 2708 of the Code provides: "Registers of marriages, births and deaths, kept in pursuance of law, or any rule of a church or religious society, may be certified by the custodian thereof; and when so certified, are presumptive evidence of the facts therein stated, as well as of the law or rule in pursuance of which such registry was made, and of the authority to certify the same."

[13.] It is insisted, however, that this statute has no application to registers of marriages, &c., made and kept out of the State. We are unable to admit this contention. The provision is found in the chapter of the present Code devoted to "Evidence," and is a part of an article thereof which undertakes to give "General Rules of Evidence." In that article are several sections declaring entries in certain books to be competent evidence; and though they contain no express declaration as to whether such books kept beyond the State would be admissible, yet it is clear that books of the class mentioned would be competent, wherever they were kept or the entries made. Such, for instance, are the books of physicians, provided for by section 2777, and entries and memoranda made by a deceased representative, guardian or trustee, as provided for by section 2778. It can scarcely be doubted, that the competency of such books is unaffected by State lines. Again, there are several other sections embraced in this article, which provide that certain certificates, books, &c., made or kept *in this State*, shall be received in evidence. This limitation is very persuasive to show that the law-makers had in mind, throughout the article, the distinction between books, records and certificates within the State, and those without; and that whenever it was the legislative purpose to confine the operation of the law to the boundaries of the State, that purpose was expressed. But, aside from these considerations, section 2780, we think, clearly indicates on its face that it was not to be confined to the State. All of its terms are general, and its last clause is wholly inconsistent with the construction contended for by appellant. That clause makes the certificate of the custodian of the record authenticated "presumptive evidence of the facts therein stated, as well as of the law or rule in pursuance of which the" record is kept, and of the authority to certify the same. With respect to such records kept in pursuance of law, the provision quoted could have no field of operation, were we to confine the act to registers kept within the State. The courts are held to know the laws of this State, which provide for records of marriages, &c.; and they could not look elsewhere than in the statute books for evidence of what these laws contain. In like manner, our courts judicially know the custodian of the records of marriages made in pursuance of laws of the State, and that he is authorized to certify transcripts thereof. But the laws of other States must be proved; and we can not give effect to the plain terms of the

[Hawes v. The State.]

section under consideration, without holding that it was intended to provide one mode for the proof of laws of other States, under which marriage registers are kept, and for proof of the authority of the custodian thereof to certify copies of the same; and, therefore, that all the provisions of that section apply as well to records made and kept beyond, as to those kept within the State.—*Carhart v. Clark's Adm'r*, 31 Ala. 396.

[14.] The Code of Mississippi was properly admitted in evidence, to show what officer in that State is the custodian of its records of marriages.—*Clanton v. Barnes*, 50 Ala. 260; Code, § 2790.

[15.] The evidence of the witness Glover, on cross-examination, as to the character of defendant, that he "had heard for the last few years that defendant had frequent difficulties with, and struck his wife," was properly admitted, under the rule laid down in the case of *Moulton v. State*, at present term.

[16.] The definitions of murder and manslaughter, given by the court in its general charge, are in accordance with the doctrines elaborately discussed and adopted by this court in the cases of *Judge v. State*, 58 Ala. 406, and *Mitchell v. State*, 60 Ala. 26; and re-affirmed in the cases of *DeArman v. State*, 71 Ala. 358; *Long v. State*, 84 Ala. 1; *Cleveland v. State*, 86 Ala. 1, and many others.

[17.] The objection to that part of the general charge, which undertook to state the theories which the evidence for the prosecution and defense, respectively, tended to establish, is untenable. The tendencies of the evidence, on either hand, appear to be very accurately set forth by the presiding judge, and his right to thus bring the facts at issue to the attention of the jury is undoubted.—Code, § 2754; *Tidwell v. State*, 70 Ala. 44; 1 Bish. Cr. Pr. § 979.

[18.] Of the charges requested by the defendant, and refused, the first and second were to the effect, that the statements of jurors, when examined on their *voir dire*, that they had no fixed opinion against capital or penitentiary punishment, and that they believed conviction could be had on circumstantial evidence, in no way interfered with, or restricted their right to determine the amount, sufficiency, or degree of proof necessary to a conviction, tended directly to mislead the jury into the belief that they would be authorized to acquit the defendant, on the ground that proof of his guilt rested solely on evidence of circumstances, notwithstanding such evidence convinced them beyond a reasonable doubt.

[Hawes v. The State.]

[19.] Charges numbered 3, 4 and 8, to the effect, that if the defendant, at the time of his second marriage, had been, or honestly believed he had been, divorced from his first wife, the law imputes innocent motives to him in contracting the last marriage, were properly refused. He was not being tried for entering into the marriage relation a second time. The motives which actuated him in that behalf, are beyond any issue involved, or which could have been raised in this case. The utmost purity of purpose in that consummation may be conceded to him, and no light be thereby thrown upon the question of his guilt or innocence. His right to marry again was precisely the same, in legal contemplation, whether he had been divorced from Emma Hawes, or had slain her; and his reasons for desiring to re-marry may have been, and doubtless were the same, however he put himself in a position to exercise the right.

[20.] The law presumes innocence of crime in all cases, until the contrary is shown. But we know of no principle upon which to this general presumption of innocence, other presumptions, depending on the relations which the alleged criminal bore to the victims of the crime, could be added. If a man, in addition to the general presumption, is entitled to further protect himself from punishment by a presumption of affection for his daughter, we see no reason why the principle may not be extended to other relatives indefinitely, and to his friends, and even to mankind at large, upon evidence of his kindly and affectionate disposition, or relations general and special, thus multiplying the issues without limit, and confusing the jury. Such is not the law. The presumption is single, and the same in all cases, and in all must be overturned by evidence which excludes every other reasonable hypothesis than that of guilt. Beyond this, whatever the relations of the alleged author and the victim of the act charged, the prosecution need not go. Charges 5, 6 and 7 were, therefore, properly refused.

[21.] Moreover, all of the charges requested by the defendant and refused were mere arguments, and most, if not all of them, of themselves indicate that they were intended to meet some position advanced in argument on the part of the State. On this ground alone each of them was properly refused.

Every exception reserved in this case has been carefully investigated. Every exception argued by counsel, and several which were not argued, have been treated in this

opinion. There are, however, several exceptions upon which we have not written, because they are patently without merit, and because of our desire to set some limit to an opinion already very long.

We find no error in the record, and the judgment of the Jefferson Criminal Court is affirmed.

The day fixed by the court below for the execution of the sentence of death pronounced against defendant having passed, it becomes our duty to specify another day for his execution. It is accordingly ordered and adjudged, that on Friday, the 28th day of February, 1890, the sheriff of Jefferson county execute the sentence of the law, by hanging the defendant, the said Dick Hawes, by the neck until he is dead, in obedience to the judgment and sentence of the Criminal Court of Jefferson county, as herein affirmed.