## *Ex parte* Nettles.

### *Application for Habeas Corpus and Bail.*

1. *Murder; classification of under our statutes.*—While our statutes have classified murder, they have, in no instance, reduced a common law murder to a lesser offense; and every murder at common law is still murder under our statutes.

2. *Same; what constitutes.*—Where a party enters into a contest dangerously armed, and fights under an undue advantage, though mutual blows pass, it is not manslaughter, but murder, if he slays his adversary pursuant to a previously formed design, either special or general, to use his weapon in a case of emergency.

3. *Bail; rules governing applications for.*—No general rules can be laid down governing every case where bail is applied for; but it is a safe practice to deny bail, whenever the court would sustain a capital conviction by the jury, if pronounced on the evidence introduced on the application for bail.

4. *Same; decision of primary tribunal denying; weight to be accorded to.*—Where the decision of the primary tribunal, denying bail, is sought to be reviewed, and the correctness of its decision rests on the weighing of evidence, the appellate court can not be unmindful of the superior advantages which the lower court has, by observing the conduct and demeanor of witnesses, in determining the weight which should be attached to the testimony of the different witnesses, and will not interfere, unless it is very clear that the primary court has erred.

5. *Dying declarations; what are not.*—Deceased received a cut two and a half inches in length, between the seventh and eighth ribs, and died six days afterwards. On the evening on which he received the wound he was asked what he thought of his chance of recovery, and on looking towards his attending physician was told that both he and another physician thought the wound a very serious one. The deceased said, however, that he hoped to recover. *Held*: Declaration made at this time, as to the rencountre, in which the wound was received, are not admissible as dying declarations.

6. *Murder; what not competent evidence on trial for.*—The fact that a neice of the deceased made a charge that the prisoner had insulted her, and that this was known to both parties, is competent on the trial of the prisoner for murder; but is not permissible to prove as a fact that such insult was given.

The petitioner, William H. Nettles, being confined in the jail of Dallas county, under an indictment for the murder of one B. F. Powell, applied to the judge of the Circuit Court (Hon. GEORGE H. CRAIG) for *habeas corpus* and bail, which was refused. The testimony on the hearing was taken down in writing; exceptions were reserved to the various rulings of the court, and to the refusal to grant bail on the evidence. And the application is here renewed under section 4850 of the Code of 1876. William M. Nettles, the father of the petitioner, was examined as a witness, and testified that, on

the day of the homicide, and just before it occurred, he was with his son at his place of business, when his son stated that he wanted to go and see Mr. Frank Powell (the deceased), who was employed at a livery stable about four or five hundred yards distant, and explain to him a difficulty which had just occurred between the petitioner and Tom. Powell, brother of deceased, in reference to alleged dishonorable proposals made by Nettles to their neice, as "Frank Powell was a reasonable man;" that at the time of this remark he had in his hands a small knife, with which he was scraping his finger-nails; that five or ten minutes after this, and after the difficulty, he saw him again, and noticed a small cut on his hand, and a bruise on his ear and the side of his head, which appeared to have been caused by a blow.

The petitioner introduced Dr. J. P. Furniss, who testified that he was a practicing physician, and had been called to see the deceased; that he found on his person an incised penetrating wound of the abdomen, between the seventh and eighth ribs; that the wound was made with a sharp instrument, which must have been at least two and a half inches in length; that after the examination, he told deceased that his wound was a serious one, and repeated to him what Dr. Riggs had said to witness about the wound, to the same effect. Witness stated that he was present when S. W. John, esq., asked Powell what he thought of his chances for recovery, and that Powell then turned an inquiring look to said witness, who then and there told Powell that his wound was a very serious one, and repeated to him what Dr. Riggs had said as to the character of his wound; that John then and there wrote down the answers of deceased to the questions asked him. This witness further testified that the deceased, in answer to a question whether he expected to recover, replied, "I hope to do so." The petitioner then offered in evidence, as the dying declarations of Powell, his answers as written down by John, which the court excluded.

The defendant then introduced one Bussey, who testified that, in two or three minutes after he was cut, Powell laid down, exclaiming "He has killed me; I am a dead man." And in connection with this evidence, again offered to introduce the answers to the questions of John, as the dying declarations of Powell, and they were again excluded. Moore, the proprietor of the stable where the homicide occurred, testified that Nettles came in the back door of the stable shortly before Powell was cut, and asked witness where Powell was. Powell, who was in the mule lot, came in, when Nettles called to him twice; they walked meeting each other, and the first word he understood was Powell's calling Nettles a liar; Powell slapped Net-

tles with his left hand open, knocking off his hat; Nettles then struck Powell and ran out of the front door of the stable. This witness testified that he did not see any weapon in Nettles' hand when he came in, nor during the combat, nor when he ran out; and that he first noticed that Powell was cut after he came back from the front door, where he followed Nettles when he ran. On cross-examination, this witness testified that he did not hear what was said by the parties previous to Powell's calling Nettles a liar; that Powell slapped Nettles immediately after the word liar was used, and that Nettles struck Powell immediately on being slapped, and ran off.

One Bussey, a witness for the State, testified that he was in the livery stable when the cutting took place; that when he first heard words, he was coming out of the mule yard, and that he got up on the fence, which divided the mule yard from the stable, and saw the deceased and some one that he did not know, who were five or six feet apart, cursing each other. This witness testified that he first heard Powell with an oath say, "Go away; I am busy;" and that he thought Powell said, "I will see you at another time;" that the other party cursed Powell, and Powell struck him with his fist; that the other party went back a step or two, and then came towards Powell and struck at him; that Powell then said, "Where is my knife, where is my knife;" then the man who struck Powell left by the front door of the stable "in a pretty fast trot." On cross-examination, this witness stated that the first thing he noticed was Powell saying in a loud tone, "Damn you," or "God damn you;" that the next thing he heard was the other party say, "Damn lie," or "Damned rascal," he could not say which; that Powell struck a pretty severe blow; that the other man had his side face to witness, and his left hand across his breast as if defending himself, and that he struck Powell with his right hand; that he saw Powell make another effort to strike about the same time the man struck him.

One Daimwood testified that he was marshal of Selma, and that on the day of the homicide he was called to his office and found Nettles there in the custody of two policemen; that he did not examine his person; that he noticed his right ear looked red or purple; and that he found a knife in the turn-key's desk, where it had been placed by the policemen who arrested Nettles. Witness then produced the knife, which he testified he had kept locked up, and testified that he had examined the knife and found no blood on it. The father of the petitioner was than recalled, and testified that the knife was the one which his son had in his hand when he started to see Powell.

[Ex parte Nettles.]

One Robert, a witness for the defendant, then testified that he was a policeman on the day of the homicide, and that he first saw defendant after he had been arrested ; that his ear was then red, and one of his hands scratched.

One West, also a witness for defendant, testified that he was a policeman, and that in company with one Quartermas he arrested defendant on the day of the homicide; that they carried him to the marshal's office, where he was searched, and a small knife found on his person. Witness thought the knife produced by Daimwood was the one found on Nettles.

One Quartermas, also a witness for petitioner, testified that he arrested the defendant on the day of the homicide, and took from his pocket a small knife, with a blade about one and a half inches long. This witness could not identify the knife produced by Daimwood as being the one taken from Nettles. He testified that, his atttention being called to it, he noticed that one of Nettles' ears looked as if he had been slapped or struck.

The State introduced one Thomas Powell, the brother of the deceased, who testified that he was standing in the door when the difficulty between his brother and Nettles occurred; that he and Nettles had just been released from arrest for disorderly conduct, and that they both arrived at the stable about the same time ; that he saw his brother come out of the mule shed, and heard Nettles call to him twice ; that his brother replied that he did not have time to attend to Nettles, to which Nettles replied, ". You have got to see me ;" to which his brother answered, " Well, if you have got to see me, what is it?" that he could not understand what Nettles then said, but heard his brother say, "Nettles, there is no use for you to parley with me, for you have insulted my neice, and no gentleman would do it ; " to which Nettles replied, "You are a God damned son of a bitch ;" that his brother then slapped Nettles with his left hand open, and Nettles returned the blow ; that both blows were struck almost at the same time, and that no other blows were struck ; that Nettles then ran out of the stable, followed by his brother, to the front door.

One Steward Farr, a witness for the State, testified that he was present when the difficulty occurred ; that when Nettles came in, the first thing he said to Powell was that " He wanted to see him ;" that Powell asked Nettles " What he wanted to see him for;" to which Nettles replied that " He wanted to see him, that was what he wanted with him ;" Powell said "You are the one that started the fuss a little while ago ; " Nettles replied, "I was not ;" Powell said, "You were," and Nettles said, " Whoever says so, is a damn liar ;"

[Ex parte Nettles.]

Powell started towards him ; Nettles turned and met him ; Nettles struck Powell, and Powell hit at Nettles, knocking off his hat and catching hold of Nettles; Powell put his hand into his pocket to get his knife ; Nettles then struck Powell in the side, jerked loose and ran ; Powell followed him to the front door, and then came back into the stable. This witness testified that he saw Nettles when he came in at the back door ; that he had a knife in his hand, which he held with the blade up his arm on the outside of his sleeve. This witness, when cross-examined, stated that Powell struck but one lick, and that he (witness) caught hold of Powell by the lappel of his coat with his right hand when he tried to get his hand in his pocket to get his knife.

The State then introduced Estelle Brown, who testified that she was the neice of, and resided with the Powells ; that, while coming home from school, Nettles accosted her on the street, walked on her way home with her, and made indecent proposals to her, as to meeting him at night, offering to pay her if she would do so ; that she made no reply whatever to these questions, and when she arrived at home informed her uncles of them. This evidence was objected to by the defendant, but his objections were overruled by the court, and he excepted.

THOS. H. WATTS, for petitioner.—Our constitution and laws give to the accused the legal right to bail, unless the proof is evident, or the presumption great, that he is guilty of murder in the first degree ; that alone being punished capitally. The common law rule, refusing bail after indictment is found, has been abrogated by our constitution and laws.—See *Ex parte* Bryant, 34 Ala. 270 ; 19 Ala. 561 ; 30 Ala. 43 ; *Ib.* 49 ; 28 Ala. 89 ; 53 Ala. 495. The question here presented is, whether the defendant, on the testimony before the Circuit Judge, is shown to be guilty of murder in the first degree. In determining this question, the Court must give the defendant the benefit of all reasonable doubts ; and if the court is not convinced, under this rule, that the defendant is guilty of murder in the first degree, he is entitled to bail as a matter of right.—See *Ex parte* Bryant, *supra*, and authorities there cited. In other States having constitutions and laws as to bail like ours, the rule above stated is sanctioned. See 2 Ashm. (Pa.) 230 ; 27 Ind. 92 ; 30 Miss. 681 ; 39 Miss. 721 ; 36 Miss. 742 ; 9 Dana, (Ky.) 40 ; 11 Leigh, 677 ; 24 Ark. 275 ; 25 Texas, 33 ; 41 Texas, 213 ; 7 La. An. 247.

Under our law, to constitute murder in the first degree there must be a *willful, deliberate, malicious,* and *premeditated* killing. If it is not *deliberate* and *premeditated* it is not mur-

[Ex parte Nettles.]

der, although it may have been *malicious* and *willful ;* and if the offense charged is not murder in the first degree bail must be granted as a matter of right. There is no discretion in the judge about it.—See authorities, *supra.* The facts must show, with *reasonable certainty,* that the defendant is guilty of murder in the first degree, or bail is a matter of right. Where a judge has refused bail, his finding on the facts is not entitled to the same weight as if the finding was on a final trial. The Supreme Court will weigh the evidence without regard to the finding of the judge below.—27 Ind. 87. The facts in this case, to say the least of them, leave it in grave doubt whether *malice* or *premeditation* can be imputed to the defendant, if they do not clearly show a case of self defense; and if any of the necessary ingredients of murder are in doubt, the defendant is entitled to the benefit of the doubt.

Attorney-General SANFORD, and S. W. JOHN, *contra.*—The evidence sought to be introduced as dying declarations, was properly excluded. To admit them as such, they must be made "under the sense of impending dissolution, when every hope of the world is gone, and every motive to falsehood silenced." Powell himself believed he would recover, and the physician had only told him that he was very seriously hurt.—52 Ala. 192 ; 47 Ala. 9 ; 12 Ala. 764 ; 1 Moody and Robinson, 551.

The evidence of Estelle Brown was properly admitted; it was offered to explain the defendant's conduct at and before the difficulty, and for this purpose was clearly admissible.— 49 Ala. 381 ; 17 Ala. 618 ; 23 Ala. 44. This evidence was also offered to show motive on the part of the defendant, and any evidence, however slight, tending to show motive, is admissible.—47 Ala. 573 ; 56 Ala. 573 ; 17 Ala. 30 ; 26 Ala. 31 ; 46 Ala. 703 ; 17 Ala. 618. This evidence was also admissible to show the state of feeling between the deceased and his slayer.—9 Conn. 47.

The rules governing application for bail to this court, after the lower has refused it, may be condensed into two. First, that it is always a safe practice to refuse bail, in all cases, when a judge would sustain a capital conviction on the evidence exhibited to him ; and, second, that, in viewing the action of the judge below it *should be clear* that he has erred in his judgment, or this court should abstain from interference.— 53 Ala. 495. Under these rules, and in the light of the evidence, the circuit judge properly refused bail, and this court must be satisfied that in doing so he committed no error.

[Ex parte Nettles.]

STONE, J.—There is very great want of order, method, and completeness in the presentation of the evidence in this record. The distances and relative position of the places mentioned are, as a rule, not so explained as that we can be profited by their consideration. This testimony was, no doubt, understood in the examination before the circuit judge; for the trial was had where the homicide was committed, before a judge who is supposed to be familiar with the localities described. Hence, he had advantages which, in the state of this record, we can not enjoy.

"All persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses, when the proof is evident, or the presumption great."—Declaration of Rights, §17. See, also, Code of 1876, §4842. The rules for admitting to bail in capital cases, under constitutions and statutes similar to ours, have been very differently declared in different States. In *Wray, ex parte,* 30 Miss. 673, the majority of the court, pronouncing on the constituents of murder, asserted principles which we emphatically disapprove. We can not too strongly express our condemnation of the popular fallacy, to use no stronger phrase, therein unfortunately countenanced, which we believe is annually rushing scores, if not hundreds of our citizens into eternity, red with their own blood causelessly shed. Until courts and juries learn to place a proper estimate on the sacredness and inestimable value of human life; learn that life is not to be taken to avenge an insult, even though gross; learn that feloneous homicide, even willful and deliberate murder, may be committed during a personal, nay, mutual rencontre; until juries learn that the crime of murder is not expunged from our statute book, nor retained only for the friendless or humble, we may expect the carnival of the manslayer to be prolonged, if not intensified. We have been led to these strong expressions by the extraordinary rulings found in the case of *Ex parte Wray, supra.* We are glad to know that one of the justices—Judge HANDY—spoke out in no ambiguous terms in condemnation of the pernicious doctrines of the majority opinion. He asserted the true principles of the law that have come to us sanctified by the wisdom and philanthropy of centuries : the law that takes life regretfully, but with unflinching purpose to protect and preserve human life, by punishing the murderer. "If a party enters into a contest dangerously armed, and fights under an undue advantage, though mutual blows pass, it is not manslaughter, but murder," if he slay his adversary pursuant to a previously formed design, either special or general, to use his weapon in an emergency. None but a wicked and depraved heart will de-

liberately determine on the death of an assailant, unless it becomes necessary to do so in defense of his own life, or to avert impending grievous bodily harm, as the law defines that phrase. —See *Judge v. The State*, at the present term. See, also, *Rex v. Thomas*, 7 Car. & Payne, 817; *State v. Craton*, 6 Ireland, 164. And we dissent with equal emphasis from the rule for admitting to bail laid down in *Moore v. The State*, 36 Miss. 137, and reasserted in *Beall v. The State*, 39 Miss. 721.

What we have said above is intended to have a general application, and is prompted by a strong conviction that it is our duty to place on record our unqualified disapprobation of the doctrine declared in *Wray, ex parte*. So far as our observation has extended, that case stands alone in the principles it enunciates. The definition and constituents of murder have come to us from the common law, that grand, colossal system which, in the purity and elevation of its morals, the maintenance of right and repression of crime, the equal protection of all in the enjoyment of life, liberty, and property, challenges the admiration of the world. Our statutes have classified murders, but in no instance have they reduced a common law murder to a lesser offense.—See Code of 1876, § 4295. Every murder at common law is murder under our statutes. If it now requires a higher degree of criminality to secure a conviction of murder than it did at common law, the fault is not in the law; it is in its lax and falsely merciful administration.

The foregoing reflections are intended to have no application to the present case, farther than the principles asserted may bear on the facts found by the jury. The cases, *Rex v. Thomas* and *State v. Craton*, *supra*, precisely define our views.

In *Com. v. Keeper of Prison*, 2 Ashm. 227, 234, a case of primary trial on application for bail, the court said, " It is difficult to lay down any precise rule for judicial government in such a case; but it would seem a safe one to refuse bail in a case of malicious homicide, where the judge would sustain a capital conviction, pronounced by a jury, on evidence of guilt, such as that exhibited on the application for bail; and to allow bail, where the prosecutor's evidence was of less efficacy." This case was affirmed and acted on in the case of the *State v. Simmons*, 19 Ohio, 141. In *ex parte* McAnally, 53 Ala. 495, this court approved the foregoing as the correct rule in the primary court, and added : " When the question is presented to a revisory court, much is due to the judgment of the primary tribunal. The witnesses are personally before it, and the examination is usually had near the scene of the alleged offense, and in the midst of the circumstances

attending the transaction. In all investigations of criminal accusations, much depends on the manner in which the witnesses testify, the feeling of partiality or prejudice they may manifest, and their general demeanor. There the primary court has the opportunity of observing, and it should be clear that it has erred in its judgment, or a revisory court should abstain from interference." In two cases since that time—*Ex parte Weaver*, at December term, 1876, and *Ex parte Allen*, September term, 1877—we have followed the rule laid down in McAnally's case. In each of the cases last mentioned, the question arose on the weighing of evidence. Under one phase of the testimony, the presumption was great that the defendant was guilty of murder in the first degree. Under the other, Weaver was not guilty of any offense, and Allen could not be guilty of anything higher than manslaughter. The judge below denied bail to each, and we refused to disturb his ruling, on the principles above declared. It is our purpose to adhere to these rules, although we are aware they are somewhat in conflict with other decisions.—*Ex parte Bryant*, 34 Ala. 270; *Ex parte Heffren*, 27 Ind. 92; *McCoy v. State*, 25 Texas, 33; *Ex parte Miller*, 41 Texas, 213.

In the present case the deceased came to his death by an incised wound, inflicted with a knife. The testimony of two witnesses is that the incision extended inwardly from the surface from $2\frac{1}{4}$ to $2\frac{1}{2}$ inches. It was a mortal wound, and that it was inflicted by the defendant does not appear to be controverted. We think a knife, capable of making a wound $2\frac{1}{4}$ inches deep, must be classed as a deadly instrument. The defendant sought the deceased at his place of business, and accosted him there. The tendency of the testimony is that he then held an open knife in his hand. Few words preceded the blows, and the fatal stab was given. An explanation is offered why the defendant had an open knife in his hand. If the defendant really sought the interview for the purpose of an explanation, and with no intention of using the knife, should a difficulty ensue, and the use of the knife was the sudden, unpremeditated result of passion, engendered by the blow, then he was not guilty of murder. On the other hand, if he had or held the knife for the purpose of using it, should a conflict ensue; and if, pursuant to such purpose, he did fatally stab the deceased, at a time when there was no apparent, pending present danger to his own life, or of that class of injury which the law defines as grievous bodily harm, then he was guilty of murder in the first degree. In determining this pivotal issue in the cause, all the attendant facts should be weighed. The state of feelings of each party, in view of the accusation then recently

[Tubb v. Fort.]

made ; the fact that the interview was of the prisoner's own seeking ; the manner of his approach and address to the deceased ; the fact, if it be a fact, that he had an open knife in his hand ; the manner of his holding it, and the explanation of his having the open knife, offered in his defense ; his words, voice and manner when he approached, and when he accosted Powell ; and whether these, and his language and conduct during the altercation, indicated pacific intentions, or the opposite—these, and all other circumstances connected with the affray, it was proper for the circuit judge to scan. Under one construction of the evidence, the offense was not bailable ; under the other, it was. The primary court had much better opportunities of construing these facts and circumstances than we can have, and we will not disturb its ruling.

We do not think the declarations of deceased, sought to be proved as dying declarations, were sufficiently shown to have been made under a sense of impending death, to justify their admission in evidence. It is not shown that the expectation of recovery was entirely destroyed.

Neither do we think it was permissible to prove as a fact the alleged insult to the little girl. That she had made such charge, and that Powell and the defendant each knew she had made it, would have been legal evidence. It sheds light on the conduct of each of the parties.

Writ of *habeas corpus* refused.