# CASES

IN THE

# SUPREME COURT OF ALABAMA.

NOVEMBER TERM, 1900.

## Miller *et al.* v. The State.

*Indictment for Murder.*

1. *Trial and its incidents; rule as to severance.*—The rule of practice which provides that where two or more persons are jointly indicted for a capital offense, the right to demand a severance shall be considered as waived, unless claimed at the time of arraignment, or at latest when the court sets a day for the trial of the case and makes an order to summon a special venire, is in no sense violative of the statute granting the right of severance when two or more persons are jointly indicted; and, therefore, if a severance is not demanded before the day on which the trial is entered upon, it will be considered as waived, and the court does not err in overruling a motion made therefor at such time.

2. *Homicide; admissibility and relevancy of evidence.*—Where two persons are jointly indicted for the murder of a police officer, and there is evidence tending to show that at the time of the homicide charged, another officer was killed by the defendants, and that at the time of the shooting the defendants had been arrested upon a charge of robbery and of other felonies, it is competent for the physician who attended the policemen after they were shot, to testify as to the course of the bullet which killed the other policeman, whose murder was not charged in the indictment; such testimony having a tendency to corroborate the other evidence adduced by the prosecution, that each of the defendants participated in the killing of the officers, with the common intent to free themselves from their captors.

3. *Same; same.*—On a trial under an indictment which charges two defendants with the murder of a police officer, where there is evidence tending to show that at the time of the killing of the officer, as alleged in the indictment, another police

[Miller *et al.* v. The State.]

officer was killed by the same defendants, and that just prior to the killing the defendants had been arrested by said officers on the charge 'of robbery, which had occurred on the same night and two or three hours before the arrest, and the issue of the identity of each of the defendants with the men whom the officers had arrested and who had killed said officers was a material and prominent issue throughout the trial, any testimony as to what occurred on the night of the killing at the place of the robbery, tending in any way to identify the defendants as having been at that place on that night, is relevant and admissible in evidence.

4. *Same; same.*—In such a case, testimony as to occurrences at the place of the robbery, though having no tendency to show that the defendants, or either of them, were present on said occasion, but which had a tendency to show such a conspiracy between the defendants to kill both the police officers, as would make each of them responsible for the death of each of the officers, and thereby showing a motive common to both the defendants to escape by means of the homicide from an arrest which meant for each of them prosecution and probable conviction of high felony, is relevant and admissible in evidence.

5. *Same; same.*—In such a case, where the evidence shows that there were a number of shots fired at the place of the killing, testimony as to the number of shells in each of the pistols carried by the police officers, which were less than the number of shots shown to have been fired, is admissible in evidence as tending to show that both the defendants fired shots at the time and place in question.

6. *Same; same.*—In such a case, it is competent to introduce evidence tending to show that the officers who were killed, had, prior to the arrest of the defendants, received information of the commission of the robbery, and that the arrest was the result of such information.

7. *Criminal proceeding; failure to object to irrelevant question.*—On the trial of a criminal case, where an irrelevant question is asked, and there is no ground for the assumption that the question would elicit competent testimony, if the defendant fails to object to such question, the answer, if responsive thereto, will not be excluded, although it is irrelevant and immaterial testimony.

8. *Same; trial and its incidents; reading of opinion by counsel in argument to jury.*—Where, in the trial of a criminal case, an attorney in his argument to the jury reads the whole of an opinion rendered in a case decided and reported in the

[Miller *et al.* v. The State.]

official reports, and some parts of the opinion are proper to be read, a general objection to the reading of the whole opinion is properly overruled.

APPEAL from the Criminal Court of Jefferson.

Tried before the Hon. SAMUEL E. GREENE.

The appellants, Frank Miller and Frank Duncan, were jointly indicted for the murder of James W. Adams. The defendant Miller was convicted of murder in the first degree, and sentenced to be hung. The defendant Duncan was convicted of murder in the first degree and sentenced to the penitentiary for life. The day the case was set for trial, and before entering upon the trial, the defendant moved the court to grant a severance, and asked that he be tried alone. This motion was overruled, and to this ruling the defendant duly excepted. No motion for a severance had been previously made by either of the defendants.

The evidence on the part of the State tended to show that on Tuesday night, the 27th of March, 1900, a little after midnight, James W. Adams and George W. Kirkley, who were policemen in the city of Birmingham, and while on duty as such policemen, were shot, from the effects of which wounds they died a few days later; that each of the officers was shot with a 38 calibre pistol bullet, but that said bullets were of apparently a different style and weight. The evidence further tended to show that on the night of the killing, between 9 and 10 o'clock, seven or eight men went to the office of the Standard Oil Company, which is located a little way out from the center of the city of Birmingham, and robbed said office; that they assaulted one Clayton, who was the night watchman, by knocking him in the head with a blunt instrument, and shooting him with a pistol; that they took from him his pistol and the keys of the office, and locked him up in a closet; that they then blew open the safe that was in the office of the company, and took therefrom something over $300 in money, a pocket book and the contents thereof; that on the afternoon of the same day of the robbery, the two defendants were seen in the neighborhood of the Standard Oil Company's office, and they made inquiries of Hunter A. Smith and Marida Wilson, who were exam-

ined as witnesses, as to whether or not policemen from the city ever came that far out in the neighborhood; that the defendants, together with several other parties, rented a room on Twentieth Street on the day of the robbery and killing, and paid a week's rent in advance; that they left the room in the afternoon of the day of killing, and never returned again. The testimony of the State further tended to show that the two defendans were arrested by the deceased policemen on the charge of robbery, grand larceny or assault with intent to murder, at the office of the Standard Oil Company, which offense, as stated above, occurred on the night of the shooting, and a short time before; that said police officers had been informed of the commission of said offense that night by Captain Weir of the police force of said city; that the defendants were seen near midnight coming from the direction of the Standard Oil Company, and were followed by the deceased officers until they were arrested; that the defendants were aware that the policemen were following them before the arrest; that the defendants went into a saloon by one door, and that while they were in the saloon Policeman Adams passed through; that thereupon the defendants went out of the other door and were seen talking together; that they were soon overtaken by the two policemen and placed under arrest; that upon being arrested they stated to the policemen that they were railroad men, one of them claiming to be an engineer and the other a fireman on the Southern Railway; that these statements as to their occupations were untrue and the policemen stated to them that they would have to go with them to the police station, which they assented to do; that Officer Kirkley was walking in front with the defendant Duncan and Officer Adams was a few feet behind them with the defendant Miller; that Duncan was on the left side of Kirkley, and Miller was on the right hand side of Adams; that they walked thus along for a short distance when all at once the policemen were fired upon, the firing on the part of the defendants being simultaneous; that fifteen or eighteen shots were fired in quick succession; that Officer Kirkley fired five shots, Adams three, and the others

were fired by the defendants; that the defendants, after the firing commenced, ran and continued to fire while they ran; that the defendant Miller wore a light colored overcoat, which he took off after the shooting began, and laid on the sidewalk, and then continued his rapid flight; that shortly thereafter the said coat was picked up by a policeman, and upon its being examined, it was found to contain the pocketbook and contents which had been stolen from the Standard Oil Company's safe a few hours before, and also a bottle not quite full of a liquid, which was shown to be highly explosive. The evidence further tended to show that Kirkley was shot in the left side, and Adams was shot in the right side.

There was evidence introduced that the defendant Miller made a voluntary confession that he was one of the parties arrested on the occasion of the shooting of Officers Adams and Kirkley, and denied that Duncan was present. He also testified to substantially the same facts.

There was evidence introduced on the part of the State identifying both of the defendants as being the persons were with the officers at the time of the shooting, and who fired the shots inflicting the fatal wounds.

The evidence for the defendants tended to show that the defendant Duncan was not present at the time of the shooting, and was not arrested by the officers. There was also evidence on the part of the defendant tending to show that Miller did not shoot either of the officers.

Captain Weir, who was the captain of the police at the time of the shooting, testified, against the objection and exception of the defendants, to having obtained information in reference to the robbery committed at the Standard Oil Company's office, and to the further fact that he communicated this information to Policemen Adams and Kirkley, and instructed them to keep a close watch for the purpose of discovering and arresting the persons who committed the crime. The other facts relating to the rulings of the trial court, which are reviewed on the present appeal, are sufficiently shown in the opinion.

W. J. CLIFT, KNOX, BOWIE & BLACKMON, and J. M. CHILTON, for appellants.—1. Severance is a matter of right and not of discretion in the court, and, therefore, the court erred in refusing to the defendant Miller the right to a separate trial, application for which was made before the trial was entered upon.—Code of 1896, § 5275; *Wilkins v. State,* 112 Ala. 55; *Wooden v. State,* 103 Ala. 23.

2. While it may be within the discretion of a presiding judge to allow counsel in argument to read extracts from the reported decisions of this or other courts which correctly state the rule of law applicable to the case on trial, yet this discretion on the part of the presiding judge is limited and restrained as follows: First, the proposition of law only must be read and not the facts of another case, and, secondly, counsel must not read any principles of law not pertinent and relevant to the issues on trial. The action of the court in permitting the entire opinion in the case of *Ex parte Nettles,* 58 Ala. 268, to be read to the jury was clearly erroneous.—*Williams v. State,* 83 Ala. 68; *Dollar v. State,* 99 Ala. 236; *Williams v. R. R. Co.,* 126 N. Y. 96; s. c. 46 A. & E. R. R. Cases, 149; *C. & A. R. R. Co. v. Bragonier,* 13 Brad. 467; *Phoenix Ins. Co. v. Allen,* 11 Mich. 501; s. c. 83 Amer. Dec. 756; *Tuller v. Talbot,* 23 Ill. 357; s. c. 76 Amer. Dec. 695; *State v. Waite,* 24 Pac. Rep. 354; s. c. 44 Kan. 310; *Pres. Pub. Co. v. McDonald,* 63 Fed. Rep. 238; 2 A. & E. Enc. of P. & P. 710.

3. The practice is well settled that illegal, irrelevant evidence may be assailed by general objection and excluded at any stage of the proceedings.—*Whilden v. Bank,* 64 Ala. 1; *McCrary v. Turk,* 29 Ala. 244; *McAlpine v. State,* 117 Ala. 100.

4. It is the duty of the court to guard against the introduction of irrelevant evidence. Such evidence is but seldom harmless.—*Whittaker v. State,* 106 Ala. 30.

5. Evidence is often competent in one homicide case and incompetent in another. The test of the relevancy of evidence in each case must depend upon the particular issues on trial.—*Henson v. State,* 114 Ala. 28.

6. The fact of a former difficulty may be admitted to show malice or motive, but the details or merits can

[Miller *et al.* v. The State.]

not be inquired into.—*Jones v. State*, 116 Ala. 468; *Garret v. State*, 76 Ala. 21; *McAnaly v. State*, 74 Ala. 9; *Gray v. State*, 63 Ala. 66; *Perry v. State*, 91 Ala. 83; *Commander v. State*, 60 Ala. 1.

7. The established rule is that evidence of another distinct offense, different from that on trial, even though of the same nature, is inadmissible.—*Ingram v. State*, 39 Ala. 247; *McDonald v. State*, 83 Ala. 46; Clark's Criminal Digest, 2469; *Gassenheimer's case*, 52 Ala. 314; *Scott v. State*, 118 Ala. 115, 117; *Wickard v. State*, 109 Ala. 45; *Martin v. State*, 104 Ala. 71; *Smith v. State*, 52 Ala. 384; *Haley v. State*, 63 Ala. 89; *U. S. v. Mitchell*, 2 Dallas, 357; s. c. 26 Fed. 1282; *Shaffner v. Commonwealth*, 72 Penn. 60; *Dabney v. State*, 113 Ala. 39.

8. On a trial for arson, evidence of the contents of the house or building destroyed is inadmissible.—*Simpson v. State*, 111 Ala. 6; *Tinney v. State*, 111 Ala. 74.

CHAS. G. BROWN, Attorney-General, H. P. HEFLIN, C. W. FERGUSON, B. M. ALLEN and FRED S. FERGUSON, for the State.—There was no error in refusing the motion of appellant Miller for a severance.—Code of 1896, p. 1200, rule 32.

It may be argued and assumed, for the purpose of argument, that the conspiracy was consummated when the robbery of Clayton and the office of the Standard Oil Company was effected, and the parties engaged therein had separated, except the two appellants. This doctrine would not avail the appellants if it appears from the evidence that the unlawful spoils gained in said robbery, had not been divided, because a conspiracy to rob or steal is not fully consummated until said spoils are divided.—*Scott v. State*, 30 Ala. 503; *Baker v. State*, 80 Wis. 416; *State v. Thaden*, 43 Minn. 223; *State v. Pratt*, 121 Mo. 566.

It is a fair inference from all the evidence in the case, that up to the hour of the killing of Adams, the several parties to such conspiracy did not have time or opportunity to divide said spoils of said robbery. If it is granted that the conspiracy had been consummated with the robbery at said office, and the separa-

tion of the parties concerned therein, and the escape of the appellants from custody was not an incident to the original conspiracy, then the question arises, was there a new and independent conspiracy, on the part of the appellants, formed or entered into by them, after they discovered that they were being followed by the officers, and were about to be arrested, with the evidence of the crimes recently committed upon them. If after discovering that they were about to be arrested, the appellants agreed or conspired together to resist arrest, or to escape if arrested, each would be guilty of what resulted from the carrying out or the attempt to carry out said unlawful purposes or designs. The same proposition would be true as to all of said conspirators, if it was an incident to said conspiracy to resist arrest, or to escape if arrested.—*Martin v. State,* 89 Ala. 115; *Gibson v. State,* 89 Ala. 121; *Jordan v. State,* 79 Ala. 9; *Spies v. People,* 122 Ill. 170; *Turner v. State,* 97 Ala. 57.

When persons enter upon an unlawful enterprise, with a common purpose to aid or encourage each other in carrying out their common design, they are each responsible for the proximate results of such unlawful designs, whether specifically contemplated or not. *Turner v. State,* 97 Ala. 57; *Martin v. State,* 89 Ala. 115; *Gibson v. State,* 89 Ala. 121.

Circumstantial evidence is always admissible to show conspiracy.—*Martin v. State,* 89 Ala. 115; *Johnson v. State,* 29 Ala. 62; *Scott v. State,* 30 Ala. 503; 80 Am. Dec., 545; *U. S. v. Goldberg,* 7 Biss. (U. S.) 175.

The following authorities, bearing upon the question of conspiracy and responsibility of co-conspirators, are cited: *Spies v. The People,* 122 Ill. 170; *Johnson v. State,* 29 Ala. 62; *Smith v. State,* 52 Ala. 407; *Jordan v. State,* 79 Ala. 9; *Williams v. State,* 81 Ala. 1; *Amos v. State,* 83 Ala. 1; *Tanner v. State,* 92 Ala. 1; *Jolly v. State,* 94 Ala. 19; *Evans v. State,* 109 Ala. 11; *Bonner v. State,* 107 Ala. 97; *State v. Pratt,* 121 Mo. 566.

Counsel for the State had the right to read the opinion of the Supreme Court of Alabama in argument. The record shows that the whole opinion was read, and defendants objected generally to the reading of said

opinion. Without admitting that any part of said opinion could not be read as a part of counsel's argument, on a general objection, the court would not be bound to separate the legal from the illegal.—*L. & N. R. R. Co. v. Hurt*, 101 Ala. 34.

Counsel may state the principles of law in argument applicable to the case, and may argue such principles, and quote from books in elucidation of their views of the law.—*Cross v. The State*, 58 Ala. 481.

In an argument to the jury in a criminal case, counsel should not be restricted by a narrow and rigid rule. *McNeil v. State*, 102 Ala. 121; *Dollar v. State*, 100 Ala. 236.

McCLELLAN, C. J.—"When two or more defendants are jointly indicted, they may be tried either jointly or separately as either may elect."—Code, § 5275. "Where two or more persons, charged with a capital offense, are jointly indicted, either of them is entitled to demand a severance, but such right shall be considered as waived unless claimed at or before the time of arraignment, or, at latest, when the court, at any term, sets a day for the trial of the case, and makes an order to summon a special venire. In other than capital offenses, a severance may be demanded at any time before the case regularly goes to the jury."—Rule 32, Code, pp. 1200-1. This rule is in no sense violative of the statute. It does not defeat nor encroach upon the right given by the statute, but is merely supplementary and complementary thereto in providing when that right must be claimed, the provision being necessary to the prompt and orderly course of justice and leaving all defendants in all cases abundant opportunity to avail themselves of the right the statute gives them. The indictment in the case at bar charges a capital offense, and falls under the first clause of the rule. By not availing themselves of the opportunity they had to demand a severance at or before the time of the order made setting a day for the trial and for a special *venire*, they waived their right; and the court committed no error in overruling and denying the motion for severance

made by defendant Miller on the day set for the trial of the case.

Dr. Whelan's testimony as to the course of the bullet which killed Kirkley was relevant and material, though this indictment is for the murder of Adams. It went to support the theory of the State, and to corroborate other evidence adduced by the prosecution that each of the defendants participated in the killing of the officers with a common intent to rid themselves of their captors.

There was a question of the identity of the defendants with the men with whom the officers had in charge, and who, after apparently submitting to arrest, suddenly set upon Adams and Kirkley and killed them. As to Duncan this issue continued throughout the trial, his defense being an *alibi*. Miller took the stand, being the last witness examined for the defense, and admitted his identity, but denied participation in the killing. But doubtless he was driven to this admission by the strong evidence introduced by the State going to show that he was one of the men arrested by the officers and participating in the homicides. So that it is not inapt to say that the issue of identity as to each of the defendants was a material and prominent issue throughout the introduction of testimony in chief by the prosecution. Both the defendants were strangers in Birmingham, the scene of the murders. They came there a day or two before the homicides. They left as soon as possible. Miller was captured in Anniston in the course of his flight. Duncan was captured in Chattanooga. Duncan denied throughout that he was in Birmingham at all. Miller was in the attitude of the same denial until he went on the stand, so far as the record shows. The testimony of the eye witnesses of the shooting tended to identify the defendants as the guilty parties, but the shooting was at night and the identification was not positive or certain. Miller was brought before Adams, and it was in evidence as a part of his dying declarations that Miller was the man who shot him, but there was evidence tending to impeach the accuracy of his declaration in this regard; and besides this declaration had no reference to the other de-

fendant. Hence it may be said to have been in a sense
necessary for the State to offer additional evidence of
identification. But whether necessary or not, it was
of course competent for the State to do so. To this
end, it is plain that the testimony of Smith tending to
show that on the afternoon before the night of the kill-
ing these defendants were in Birmingham, that he then
saw and talked with them on the outskirts of the city,
and, in connection with other testimony to be presently
adverted to, that this was in the neighborhood of the
Standard Oil Company's office and that one of them
asked him whether the police came out that far, was
properly received in evidence. And Marida Wilson's
testimony was properly admitted in corroboration of
Smith's. So, too, the testimony of Frank Brown that on
the morning of the day before the shooting he rented a
room for a week to a party of six or seven men, that the
defendants were of or with this party, that they paid for
the room for the time mentioned in advance, but disap-
peared from it that afternoon or early evening and
never came back. So, too, the evidence of the witness
Clayton, watchman at the Standard •Oil Company's
place ,that he saw the defendants at the Standard Oil
Company's office on the outside of the fence on the Sun-
day or Monday afternoon before the murder, that a party
of seven or eight men came there between nine and ten
o'clock that night and that two of said party were
about the size and general appearance of the defend-
ants. The further testimony that these men took a pis-
tol from the witness was competent in connection with
other testimony that this pistol was found in the room
where Duncan was arrested at Chattanooga and was
then claimed by Duncan as his pistol, that it was a 38
calibre pistol but carried a ball different from the 38
calibre ball of a Smith & Wesson pistol, that on the
night of the killing Miller had a 38 calibre Smith &
Wesson, that one of the officers was shot with a bullet
of that calibre such as is used in Smith & Wesson pis-
tols, and that the other was shot with a bullet of that
calibre differing from the Smith & Wesson bullet in
being heavier, like the bullets used in the pistol taken
from Clayton and recovered from Duncan. Similarly

it was competent for Clayton to testify that one of the men at the Standard Oil Company's place wore a light overcoat like the coat which other evidence showed was worn by one of the persons who did the shooting, and which he took off and laid down on the street in his flight. And, there being evidence that in the pockets of this coat was found a bottle which contained a fluid resembling nitro-glycerine in appearance, that the bottle was not full and that the fluid found in the bottle was a very powerful explosive, testimony tending to show that the Standard Oil Company's safe was blown open with a fluid explosive by the party of men of which there was yet other evidence that defendants were members, was properly admitted on the question of identity. And upon the same considerations, the further testimony of Wofford that a pocket book containing certain papers which was also found in a pocket of that overcoat had been left by him in the Standard Oil Company's safe and had been taken therefrom on that night by said party of men, was properly received. And so of any other testimony as to what occurred that night at the Standard Oil Company's office *tending to identify these defendants as* having been at that place on the night of and two or three hours before the shooting.

There was, however, some testimony received as to occurrences at the Standard Oil Company's place, which have no tendency to show that the defendants, or either of them, were there on the occasion in question, and which, therefore, throw no light upon their identity with the men who killed Adams and Kirkley. For instances: The State's counsel referring to what occurred at that place on the occasion when Clayton's pistol was taken, the safe was blown open and Wofford's pocket book was removed therefrom and carried away, asked Clayton this question: "Well, was anything done to you the night of the 27th of March?" And he replied: "Well, I was knocked in the head and shot in the foot." And this question and answer: "Now, Mr. Clayton, just tell all about it, all that happened that night?" "Well, I have told all that happened that night. I was assaulted and knocked in the head

and my pistol taken away and the keys, and I was put in a room—the closet—locked up." And this question to same witness: "If anything was said about killing you, tell the jury what it was." To which he replied: "I can't say what was said. I noticed one of the men waived his hand and said something and stopped them from shooting me." The witness Wofford was asked: "Was there any money missing from the safe?" Reply: "Yes, sir." He was asked: "How much money was taken from the safe, Mr. Wofford?" And to this he replied: "Three hundred and thirty odd dollars." Clayton also testified, as we have seen, that having "knocked him in the head and shot him in the foot they took his pistol away from him." This testimony of Clayton and Wofford went to prove four separate felonies against the defendants as constituting in part the gang who were at the Standard Oil Company's place that night; an assault on, with intent to murder Clayton, the robbery of the pistol from Clayton, burglary in breaking into, and grand larceny in taking the money from the safe. The taking of the pistol was, as we have seen, competent on the question of identity. But the admission of the testimony of Clayton and Wofford as to the assault upon Clayton, the burglary and the larceny of the money must find justification upon another ground, if it was admissible, since it has no bearing upon identity. We think there is such other ground upon which its competency may be rested. It had a tendency to show a conspiracy between the defendants to kill both Adams and Kirkley, such preconcert of action on their parts to the deaths of both the officers as makes each of the prisoners responsible for the death of each of the officers though only Miller shot Adams and Duncan shot Kirkley. It has this legitimate operation in the case through its tendency to show a motive common to both Miller and Duncan to escape from an arrest which for each of them meant prosecution, and probable conviction of these high felonies. Indeed, we understand it to be a recognized exception to the rule against proof of other offenses on the trial of that charged in the indictment, to admit such proof when it goes to show motive for the act under investiga-

tion, and this aside from any question of conspiracy. *Hames v. State,* 88 Ala. 37, 67; *Gassenheimer v. State,* 52 Ala. 313, 318; *Rex v. Clews,* 4 Car. & Payne, 221; *Goerson v. Com.,* 99 Pa. 388; *Ingram v. State,* 39 Ala. 247, and we do not understand that the prosecution is cut off from such proof in any case by the circumstance that the ulterior purpose for which the criminal act is done is apparent on the case as presented without it; and certainly error could not be committed in receiving competent evidence of motive though it be cumulative merely and unnecessary. But such evidence was not cumulative merely and unnecessary in this case even if it be considered as bearing upon one of the defendants only and involving no question of concert between them. Let it be applied to Miller for example. He testified that he did not shoot Adams or Kirkley, but merely ran away when the opportunity offered. The testimony for the State was that he shot Adams. Now had he committed only a small offense it would have been much more probable that his story was true, for in such case while he might well have so desired to escape the consequences of even a slight infraction of law as to run away when he got a chance, yet it would be improbable that he would commit the highest crime known to the law in avoidance of the unimportant consequences of its violation in a minimum degree; while on the other hand, having committed heinous offenses, crimes which would entail upon him years of imprisonment, if not death, his motive to escape would be so much more powerful as to legitimately afford ground for an inference by the jury that it drove him to murder, and that he did not run away, as he testified, but that he took the life of his captor, as the State's evidence went to show.—*Rex v. Clews,* 4 Car. & Payne, 221.

But it is in the other aspect of the case, the aspect involving a conspiracy, that the reasons for receiving evidence of the offenses committed at the Standard Oil Company's place become more cogent, and the necessity for such evidence more apparent. As upon the theory of the State one of the defendants shot Adams and the other Kirkley, it was necessary for the State to make a case on the trial of this indictment against

both of them for the murder of Adams upon which both would be answerable for his death though one did not set in motion the force that killed him. The defendants when arrested were coming from the direction of the Oil Company's place. They had seen the officers shortly before come into a saloon where they were. They seemed there to evince some consciousness that the officers might be after them. Leaving there they were together a few minutes in the street before the officers accosted them. This was an opportunity to pre-concert resistance to the officers or efforts to escape should they be arrested. It seems they expected the officers to take their accounts of their identity as employes of the Southern Railway as true and thus escape arrest. Relying perhaps in some measure on this they were probably not in a satisfactory attitude for resistance when the officers told them they would have to go to the station house. The statement as to who they were was false and must have been preconcerted. The first shot was fired by Miller, who was in charge of Adams, walking behind Kirkley and Duncan. Immediately thereupon Duncan shot Kirkley. Such are the tendecies of the State's evidence. From all this the jury might or might not have inferred preconcert in the shooting. If Miller and Duncan had not been seen together before going into the saloon there would have been less ground to infer conspiracy to kill to avoid imprisonment. If neither of them had been guilty of any offense authorizing their arrest the basis of inference of conspiracy to kill would have been weak indeed. If one had been guilty of a trifling offense, and the other of the felonies committed earlier in the night the basis for such an inference would have been only a little less weak. But if both were shown to have been guilty of the several great crimes committed at the Standard Oil Company's office that night they had a *community of interest*, and each a great interest, in con-spiring together to prevent capture and imprisonment, and by proof of the existence of such common interest, furnishing a powerful motive for their remaining to-gether and acting to the last extremity together to the security of each other from incarceration, the basis for

the inference on the part of the jury that they acted under *"a community of design,"* that one of them shot Adams and the other Kirkley in carrying out a previous understanding to protect each other from the great peril that threatened them both, was infinitely strengthened. That peril and the motive it bred could only be gotten before the jury by evidence of the other offenses committed by the defendants, and the tendency of that evidence went legitimately to the establishment of such preconcert of action on the part of the defendants as imports the guilt of both of the murder of Adams.— *Mason & Franklin v. State,* 42 Ala. 532, 539; *People v. Parl,* 27 Cal. 572.

The principles upon which we hold that evidence of other offenses committed by the defendants is admissible, bear no analogy to that upon which evidence of former difficulties between the parties to a personal rencounter under investigation is received. In this latter class of cases the evidence is, under proper circumstances, received to show the state of feeling between the parties to the rencounter, it is confined to former troubles between such parties, and the occurrences of the former difficulties and not the merits or particulars of them are admissible. But in the case at bar there is no suggestion of any former difficulty between the deceased and the defendants, there is no question of personal feeling between them at all involved. The other offenses are allowed in evidence to show a motive for committing the offense under investigation. The existence of this motive depends upon the inquiry whether the defendants committed the other offenses, and of course proof that they did commit them must needs involve evidence as to the particulars of those offenses, evidence of the several acts which enter into and constitute them.

There was evidence going to show that as many as eighteen shots were fired at the place of the killing. The evidence that only three of the shells in Adams' pistol were empty after the shooting and five in Kirkley's tended to show that both the defendants fired shots at that time and place, and there was no error in receiving it.

[Miller *et al.* v. The State.]

Defendants' witness Fay having testified on cross-examination "that he rented a room over Gelder's restaurant [the room above referred to as, upon one tendency of the evidence, having been rented for the party to which defendants belonged] on the day before the shooting, the place where Frank Brown, the porter, was; that he furnished the money himself and rented the room for himself, and that he made the money with which the room was rented," was asked this question by the State: "Where did you get the money with which you rented the room?" This question was irrelevant. The witness having just sworn that the money belonged to him and that he had made it himself, there was no ground for any assumption that this interrogatory would or might elicit competent testimony to the effect that he got the money from the gang of men, defendants among the rest, who were in and about the room the day before the shooting; so that defendants' failure to object to the question cannot be excused upon that theory. And not having objected to the question, they were not entitled to have the responsive answer, viz., "I played cards for it," excluded. And, moreover, this evidence of Fay had a tendency to emphasize his testimony that defendants were not concerned in the renting of the room, and thus rather to benefit than to injure them, in rebutting other evidence before the jury going to show that all the party including defendants were concerned in renting the room. That they were all so concerned was a pertinent fact on this trial as tending to prove the connection of the defendants with the crimes committed at the Oil Company's office.

Certainly there are parts of the opinion in *Ex parte Nettles* (58 Ala. 268) proper to be read by counsel in argument on a trial such as this was. The whole of that opinion was read in argument by State's counsel to the jury, and as a whole it was objected to. The court committed no error in overruling the objection that was made.

We think it was proper to be gotten before the jury that Adams and Kirkley had information in a general way of occurrences at the Oil Company's place when they arrested the defendants. Their then knowledge

on that subject would seem to be a part of the immediate environment of the homicide giving color to the acts of the officers. But apart from this, the fact that Weir had informed the officers about what had occurred out there could not have prejudiced the defendants on this trial.—Code, § 4333.

In the foregoing opinion all the points treated of in briefs of appellants' counsel are either expressly discussed or covered by general propositions. Many exceptions were reserved to the admission in evidence of responsive answers to questions which were not objected to. These exceptions are, of course, unavailing. In many other instances there were objections to questions which were not followed by the reservation of exceptions to adverse rulings of the court upon the objections. This was also abortive to present any question for review. For the rest—exceptions which were properly reserved, but which were not discussed by counsel—the court has examined and considered them *en banc*, and found them to be so without merit as that a discussion of them would serve no good purpose.

We find no error in the judgment and it must be affirmed; and the day for the execution of the defendant Miller having passed, this court fixes Friday, the 28th day of June, 1901, for the execution of the sentence of death imposed upon said Frank Miller.

Affirmed.